[No. S025519. May 23, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
COLIN RAKER DICKEY, Defendant and Appellant.

886

## COUNSEL

James W. Haworth, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Jean M. Marinovich and J. Robert Jibson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

BROWN, J.—A jury found defendant Colin Raker Dickey guilty of the murders of Marie Caton and Louis Freiri, finding true special circumstances of felony-murder robbery, felony-murder burglary, and multiple murder. (Pen. Code, § 190.2, subds. (a)(3), (17)(A), (G).)[1] The jury also found defendant guilty of first degree robbery with regard to each of the victims, and first degree burglary. At the penalty phase, the jury fixed the punishment for the murders at death. This appeal is automatic. (§ 1239, subd. (b).)

We affirm the judgment in its entirety.

### I. FACTS

#### A. *Guilt Phase*

##### 1. *The prosecution case*

The murder victims were Fresno residents—Marie Caton, 76, and Louis Freiri, 67, a friend and boarder of Mrs. Caton's. Their bodies were discovered by one of Mrs. Caton's daughters, Lavelle Garratt. Mrs. Garratt or her sister checked on their mother every day, "[b]ecause she was lonely, because she was our mother, because we loved her and we wanted to see her."

Late in the afternoon of November 8, 1988, when Mrs. Garratt could not reach her mother by telephone, she drove to her house. She found Mrs. Caton on the floor of her bedroom, covered with a bloodstained blanket. Mrs. Caton had been beaten so badly her eyes bulged out of their sockets like golf balls. Mrs. Caton also had knife wounds on her chest and a jagged cut on her back. She lingered for 11 days, but never regained consciousness. The cause of death was respiratory failure associated with "shock lung syndrome," the shock having been caused by her injuries.

---

[1] Unless otherwise indicated, all further section references are to the Penal Code.

Mr. Freiri wore a brace on his right leg and required a cane. Mrs. Garratt found him facedown, stretched across the archway between the dining room and the living room. A chair, wall, and window blinds near his body were bloodstained. Pieces of his cane were found in the living room and one of the bedrooms. Mr. Freiri had been stabbed in the chest, armpit, and forearm; he also had a bone-deep laceration on his forehead. He was stabbed with such force that two of his ribs were broken. He died of blood loss.

Mrs. Garratt told the police she suspected her son, Richard Cullumber. Cullumber was, Mrs. Garratt believed, a drug addict, and he asked his grandmother Mrs. Caton for money—cash she would take out of a buffet drawer—almost every day. Mrs. Caton "grew up during the Depression and she was afraid of being hungry again, I guess, and so she hid money all over." Among other caches, Mrs. Caton kept at least $6,000 in cash in a metal box placed inside a suitcase stored under her bed. She also kept a smaller sum in another suitcase.

Cullumber, also known as "R.C.," lived in an apartment in Fresno, along with defendant, Gail Goldman, Richard Buchanan, and two other men. The night of the murders Cullumber packed his bag and left the apartment. He returned several days later but fled again when informed the police were looking for him. On November 12, 1988, after a high-speed police chase, Cullumber, cornered, killed himself.

The pistol Cullumber used to shoot himself was registered to Mr. Freiri. He had earlier warned the driver of a car he commandeered, "I need the car; I've already killed a woman."

Two knives possibly linked to the murders were discovered in Mrs. Caton's kitchen—a butcher knife and a steak knife. The steak knife (People's exhibit No. 18) was, in the opinion of defendant's housemates Gail Goldman and Richard Buchanan, identical to a knife belonging in their apartment.

In addition to his knife wounds, Mr. Freiri had a four-inch-long ligature wound, caused by a cord that was wrapped around his neck. It was a cotton cord of the color, weave, and texture used in venetian blinds. The venetian blinds in Mrs. Caton's house were intact, but a venetian blind kept in the hall closet of the apartment defendant shared with Cullumber and the others was missing its cord. On the night of the murders, Gene Buchanan saw defendant remove a venetian blind from the closet of their apartment, walk into the bedroom with it, and then replace it in the closet. Goldman testified it was

Cullumber who had done that. Defendant's thumbprint was found on a slat from the venetian blind found by the police in the apartment closet.[2]

The case against defendant rested on the testimony of Gail Goldman and Gene Buchanan.[3]

### a) *The testimony of Gail Goldman*[4]

Goldman shared a one-bedroom apartment in Fresno with defendant, Cullumber, Buchanan, and two other men. According to Detective Doug Stokes, Goldman told him "about a venetian blind that had been in the hall closet that was . . . taken by the suspect, Dickey, . . . into a bedroom and that the cord was removed from that venetian blind and then the venetian blind was placed back inside the hall closet." However, when she testified, Goldman said it was Cullumber who took the venetian blind out of the closet and went into the bedroom with it. Later, she testified, the blind had been replaced in the closet, but the cord was missing from a blind in the bedroom.

At approximately the same time that Cullumber was engaged with the venetian blind, defendant walked into the kitchen and opened a drawer containing knives and other silverware.[5] According to Detective Stokes, Goldman told him defendant removed a knife from the drawer and left the kitchen with it. Again according to Detective Stokes, when he came to the apartment investigating the murders, he showed Goldman a knife. She told him, "I have a knife exactly like that knife, or they are twins."

After the activity just described, Goldman testified, defendant and Cullumber left the apartment. They had no money, Goldman believed, when they left. If Cullumber had money, he spent it on drugs; before defendant left he asked Goldman for money to buy cigarettes. However, when they returned, Cullumber gave Goldman $40 or $50 in cash, saying it was in partial payment of what he owed her. Cullumber then packed his clothes and left.

---

[2] No usable prints were found at the scene of the crime, not even those of Mrs. Caton or Mr. Freiri.

[3] Defendant impeached Buchanan on the grounds, among others, that his testimony against defendant was motivated by revenge and a desire to collect the reward offered by Mrs. Caton's relatives: Defendant was less successful in attacking Goldman's credibility. If not a hostile witness for the prosecution, she was clearly reluctant to testify against defendant, both because she was fond of him and because she feared the consequences of informing on anyone. A critical question, then, is to what extent Goldman's testimony corroborates Buchanan's. To facilitate consideration of that question, we have set out their testimony separately.

[4] Because she died before the trial began, Goldman's preliminary hearing testimony was read into the record. (See Evid. Code, § 240, subd. (a)(3).)

[5] Goldman later testified she did not know which drawer defendant had opened.

Sometime thereafter, while Goldman and defendant were watching the news on television, they saw a story about this crime. Defendant became upset when he learned Mr. Freiri was dead and that Mrs. Caton, while near death, was still alive. He told Goldman to come into the bedroom, that he wanted to talk to her. Buchanan followed them into the bedroom.

Defendant told them he had accompanied Cullumber to the home of Mrs. Caton. On the one hand, defendant said that Cullumber had assured him "nothing was going to happen." On the other hand, defendant admitted he had gone with Cullumber "[t]o help [him] get the money." With Mrs. Caton present, defendant looked for money in her bedroom, where Cullumber told him it could be found. When defendant stepped out of the bedroom and saw Mr. Freiri slumped over in a chair, he "knew something had happened." Cullumber "went berserk. He came into the bedroom and started beating up on his grandmother." Defendant and Cullumber found $700, which they split.

Defendant was crying, "like he was sad," when he confessed to Goldman and Buchanan. Later, when defendant learned Mrs. Caton had died, "he wasn't as depressed as he was before."

While he was confessing, defendant said maybe he should turn himself in. Goldman advised him against it. When Detective Stokes first asked Goldman whether she knew anything about these crimes, Goldman denied that she did. Defendant was a good friend of hers, she still liked him, and she did not want to do anything to get him into trouble. She did not want to tell on anyone, especially someone she liked as much as she liked defendant. Buchanan told her he was going to turn defendant in for the reward. By contrast, Goldman testified at the preliminary hearing only because she had been subpoenaed. During a break, Goldman told the prosecutor she wanted to make sure defendant knew she was not the one who turned him in. She was afraid for her life. "I always felt that if you would inform on somebody they would kill you or have you killed." Defendant said he was not concerned that someone would betray him, "because if they did, they wouldn't do it again." On the other hand, Goldman thought that her relationship with defendant was such that "it would take an awful lot to make him hurt me."

Goldman had "had 20 surgeries on [her] stomach," and depending on how much pain she was in, she used "speed ball cocaine and heroin" or other "street drugs" to kill the pain.

b) *The testimony of Gene Buchanan*

One evening in November 1988, defendant took a venetian blind from the hall closet of the apartment he shared with Buchanan, Cullumber, Goldman,

and two others. Defendant took the blind into the bedroom and shortly thereafter replaced it in the closet. Buchanan looked into the bedroom. On the bed was a knife belonging to Gail Goldman, a knife with a bone handle and a serrated edge. People's exhibit No. 18 was that knife, or else it looked exactly like Goldman's knife.

Defendant and Cullumber left the apartment around 9:00 p.m. That night everyone living in the apartment was broke, or claimed to be. However, when defendant and Cullumber returned, defendant opened his wallet and said, "I got $350," and, "call the connection."

Buchanan ordered drugs, which were injected by defendant, Cullumber, Goldman, and Buchanan. Afterwards, Cullumber asked Buchanan to take him for a drive; defendant went along. Defendant directed Buchanan to a canal, and as they drove over it, defendant threw in a pair of shoes. After looking for a good place to do it, defendant also threw his jacket out of the window.

About two days later, Buchanan and defendant were in the living room of the apartment; defendant was watching the news on television. Defendant jumped up and ran into the bedroom to Goldman. Buchanan heard Goldman say, " 'Oh, my God, how low can you go,' or 'get'; something to that effect." Buchanan went into the bedroom to find out what was going on. Defendant said to him, "I've already told her, so I might as well tell you."

Defendant told Buchanan that "him and R.C. had been over to R.C.'s grandmother's house, and that they had entered the house—how he had done it, how he had walked up to the door, knocked, faked like R.C. was going to be in jail, needed to use the phone, and then R.C. sneaked in, they were supposed to tie them up, get this money and everything. And while the defendant is supposedly in the bedroom looking for the money he hears a commotion, looked out the bedroom door, sees an elderly man with his head slumped down, considers him dead, and that if you kill one you might as well kill them both."

In response to the prosecutor's questions, Buchanan clarified his testimony. "[Defendant] said that he—only what he thought, he didn't say what he did. He said that, 'If you kill one you might as well kill them both.' " "[H]e didn't say he said it to R.C., he just said it as that was his opinion." Defendant did not tell Buchanan what happened after he had this thought.

Defendant also told Buchanan that what prompted his confession was a television story saying that Mrs. Caton "was still alive when she should have been dead."

Buchanan did not speak to the police until several months after defendant's confession to him. At a convenience store he saw a flyer announcing a

reward, and he left his name with the clerk. He was then contacted by a grandson of Mrs. Caton's, and he agreed to speak to Detective Stokes. However, his willingness to do so was not motivated by the reward; it was his "Christian upbringing." He did not tell Goldman he was going to turn defendant in for the reward.

Defendant had torn up Buchanan's one photograph of his youngest daughter, which made Buchanan angry. He wanted to throw defendant off the balcony of a motel, but Goldman stopped him.

Buchanan used drugs "[a]s often as I can get them." He injected "speedballs," a heroin/cocaine mixture. He used drugs an hour or two before defendant confessed to him, and he continued to do so as recently as the day before his testimony.

### 2. *The defense case*

Defendant testified he did not make the statements attributed to him by Goldman and Buchanan, and that he did not have anything to do with these crimes. He got along well with Goldman, but not with Buchanan, who was "just a snake; a deceitful person." His fingerprint was on the venetian blind because it had fallen off the back door and he had put it into the closet; he did not know why the cord was missing from it. He did rip up the photograph of Buchanan's daughter.

John Inderrienden had known Goldman for five or six years, and they had once lived in the same apartment building. He "wouldn't trust her as far as I could throw her, and she weighed quite a bit."

Goldman once lived in a house owned by Harry Arax. She did not pay her rent, nor did she pay her bill at his market.

Goldman, a former neighbor of Peter Najarian's, told him she was going to be a witness in a murder case, but that she "didn't know nothing about no murder."

Magadelena Desumala, who ran a halfway house in which Goldman lived on and off for about 10 years, was "like a sister" to Goldman. She said Goldman told her it was the grandson of the murder victim who had confessed to her.

B. *Penalty Phase*

The only witness who testified at the penalty phase, Detective Stokes, was called by the prosecution to provide a foundation for the admission of the autopsy photographs. No other evidence, aside from a stipulation to defendant's prior burglary conviction, was introduced.[6]

II. Discussion

A. *Guilt Phase Issues*

1. *Felony-murder special circumstances*

a) *Sufficiency of the evidence as to aiding or abetting*

Defendant contends the evidence was insufficient to support the felony-murder special-circumstance findings. Defendant does not contend the evidence was insufficient to prove he planned and participated in the burglaries and robberies; he concedes it was sufficient. Rather, defendant contends the prosecution was required to prove, not only that he aided or abetted the burglaries and robberies, but also that he "assisted in the killings themselves."

Defendant relies upon the language we italicize in section 190.2, former subdivision (b). "Every person whether or not the actual killer found guilty of intentionally *aiding, abetting . . . or assisting* any actor *in the commission of murder in the first degree* shall suffer death or confinement in state prison for a term of life without the possibility of parole, in any case in which one or more of the special circumstances enumerated in [specified paragraphs covering, among others, the crimes of burglary and robbery] of subdivision (a) of this section has been charged and specially found under Section 190.4 to be true." (§ 190.2, former subd. (b), added by initiative measure Prop. 7, § 6, approved by the electorate Nov. 7, 1978; see now § 190.2, subd. (c).)

■ Section 190.2, former subdivision (b) is not helpful to defendant because, under the felony-murder doctrine, he *was* found guilty of aiding or abetting first degree murders. All persons aiding or abetting the commission of burglary or robbery are guilty of first degree murder when one of them kills while acting in furtherance of the common design. (§ 189; *People v. Pulido* (1997) 15 Cal.4th 713, 716 [63 Cal.Rptr.2d 625, 936 P.2d 1235]; *People v. Washington* (1965) 62 Cal.2d 777, 782 [44 Cal.Rptr. 442, 402 P.2d 130].)

---

[6] Defense counsel's failure to present mitigating evidence is discussed below. (See *post*, at pp. 926–927.)

Defendant also relies on *People v. Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306] (*Anderson*), to support his argument that the "actus reus of a special circumstance requires that a defendant aid or abet the actual killing, not just the underlying felony." In particular, defendant relies upon the following statement in *Anderson*: "[G]iven a realistic reading the statutory requirement that the aider and abetter intentionally aid, abet, counsel, command, induce, solicit, request, or assist any acts in the commission of first degree murder—even when applied to felony murder—is not ambiguous: the aider and abetter must intentionally aid *in a killing*." (*Anderson*, at p. 1145.)

█ Defendant's reliance on *Anderson* is unfounded. It is axiomatic a decision does not stand for a proposition not considered by the court. (*People v. Barker* (2004) 34 Cal.4th 345, 354 [18 Cal.Rptr.3d 260, 96 P.3d 507]; *People v. Harris* (1989) 47 Cal.3d 1047, 1071 [255 Cal.Rptr. 352, 767 P.2d 619] (*Harris*).) The proposition advanced by defendant—for a felony-murder special circumstance, the aiding or abetting has to relate to the act of killing itself, rather than just the underlying felony—was not considered by the court in *Anderson*.

The question we considered in *Anderson*—reconsidered, actually—was "whether and under what circumstances intent to kill is an element of the felony-murder special circumstance." (*Anderson*, *supra*, 43 Cal.3d at p. 1141.)

█ *Anderson* overruled *Carlos v. Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862] (*Carlos*). "In *Carlos* . . . , we held that intent to kill was an element of the felony-murder special circumstance whether or not the defendant was the actual killer." (*Anderson*, *supra*, 43 Cal.3d at p. 1139.) In *Anderson*, we concluded "the broad holding of *Carlos* that intent to kill is an element of the felony-murder special circumstance cannot stand, and that the following narrow holding must be put in its place: intent to kill is not an element of the felony-murder special circumstance; but when the defendant is an aider and abetter rather than the actual killer, intent must be proved before the trier of fact can find the special circumstance to be true." (*Id.* at pp. 1138–1139.)

The premise of the decision in *Carlos*, the *Anderson* court explained, "was our determination that section 190.2[, subdivision] (a)(17) is ambiguous. As shown above, on further reflection we now believe that premise was mistaken: given a fair reading, section 190.2[, subdivision] (a)(17) provides that intent is not an element of the felony-murder special circumstance." (*Anderson*, *supra*, 43 Cal.3d at p. 1143.)

According to *Anderson*, *Carlos*'s mistaken premise rested on two bases. (*Anderson*, *supra*, 43 Cal.3d at pp. 1143–1145.) The statement relied upon by defendant appears in the context of *Anderson*'s reexamination of the second of the two bases.

"The second basis of our analysis in *Carlos* was our belief that unless section 190.2[, subdivision] (a)(17) were read to require intent to kill, the meaning and function of section 190.2[, subdivision] (b) would be hard to determine: 'In the first place, paragraph 17, alone of the listed paragraphs, already contains language equating the liability of principal and accomplice. In addition, the requirement that the accomplice "intentionally" aid in the commission of a murder is inherently ambiguous when applied to a felony murder, for it could mean either that the accomplice must intentionally aid in a killing, or that he need only intentionally aid the commission of the underlying felony.' ([*Carlos*, *supra*,] 35 Cal.3d at p. 142.)

"On reexamination we now find this basis, too, to be lacking. First, section 190.2[, subdivision] (a)(17) does not treat the liability of the murderer and *his* aider and abetter, but rather the liability of the perpetrator of the underlying felony and *his* aider and abetter. Thus, the statutory provision does nothing more than declare that both the perpetrator of the underlying felony and his aider and abetter are felony murderers. Section 190.2[, subdivision] (b) then declares that the felony-murder aider and abetter is eligible for the death penalty if intent to kill is proved. Second, given a realistic reading the statutory requirement that the aider and abetter intentionally aid, abet, counsel, command, induce, solicit, request, or assist any acts in the commission of first degree murder—even when applied to felony murder—is not ambiguous: the aider and abetter must intentionally aid *in a killing*." (*Anderson*, *supra*, 43 Cal.3d at pp. 1144–1145.)

In the paragraph immediately following the statement upon which defendant relies we reiterated the issue we were actually resolving in *Anderson*. "Thus, in *Carlos* we mistook the first and crucial step in our analysis by determining that section 190.2[, subdivision] (a)(17) is ambiguous: given a fair reading in conjunction with section 190.2[, subdivision] (b), the provision can realistically be read only to require intent to kill for the aider and abetter but not for the actual killer." (*Anderson*, *supra*, 43 Cal.3d at p. 1145.)[7]

---

[7] Defendant's reliance upon *People v. Sanders* (1990) 51 Cal.3d 471 [273 Cal.Rptr. 537, 797 P.2d 561], is also unavailing. The *Sanders* court quoted the statement in question from *Anderson*. (*Sanders*, at p. 517.) However, like the *Anderson* court, the *Sanders* court did not hold the aiding or abetting underlying a felony-murder special-circumstance finding has to relate to the act of killing itself, rather than just the underlying felony. In *Sanders*, the defendant claimed the evidence did not show whether he or his confederate was the actual

Finally, defendant recasts this argument as an instructional claim. He contends the trial court prejudicially erred by failing to instruct the jury he had to have aided or abetted the actual killings, not just the underlying felonies. For the reasons stated, this contention lacks merit.

b) *Sufficiency of the evidence as to intent*

Defendant contends the evidence was insufficient to prove he had the requisite intent to kill his victims.

■ In reviewing the sufficiency of the evidence for a special circumstance, as for a conviction, we ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt. (*People v. Hart* (1999) 20 Cal.4th 546, 607 [85 Cal.Rptr.2d 132, 976 P.2d 683]; *People v. Rowland* (1992) 4 Cal.4th 238, 271 [14 Cal.Rptr.2d 377, 841 P.2d 897]; *People v. Mickey* (1991) 54 Cal.3d 612, 678 [286 Cal.Rptr. 801, 818 P.2d 84].)

As proof of defendant's intent to kill, the prosecution relied on his confession to Buchanan that, upon seeing the apparently lifeless body of Mr. Freiri, defendant thought to himself, "If you kill one you might as well kill them both."

Defendant contends his statement to Buchanan is susceptible to the interpretation, not that he intended to kill the victims, but that he realized the penalty provided by law would be the same whether both or only one of them were killed. While that is true, defendant did not urge the less damning interpretation below. At trial, he denied having made the statement to Buchanan at all, and claimed to have had nothing to do with these crimes. More to the point, although the language used by defendant was susceptible to more than one reasonable interpretation, the interpretation urged by the prosecution, that defendant intended to kill his victims, was certainly one reasonable jurors could reach.

In the alternative, and assuming arguendo the evidence of his intent to kill was sufficient with regard to Mrs. Caton, defendant contends it was insufficient as to Mr. Freiri. The statement the prosecution relies upon, defendant points out, concerned a thought—"If you kill one you might as well kill them

---

killer. Therefore, he contended, two felony-based special-circumstance findings should be reversed because the jury was not instructed to determine whether he intended to kill the victim. (*Id.* at p. 516.) We held the jury had been adequately instructed on this point. (*Id.* at p. 517.)

both"—that occurred to defendant after he discovered Mr. Freiri had apparently been killed by Cullumber. "The very basis for the thought was the assumption that Mr. Freiri was dead. . . . If one thinks that a person is dead, there can be no intent to kill that person."

However, Buchanan's testimony as to defendant's statement did not occur in a vacuum. While the prosecution did not rely upon it, there was ample evidence defendant formed the intent to kill Mr. Freiri before he discovered his body. (*People v. Williams* (1997) 16 Cal.4th 635, 678–679 [66 Cal.Rptr.2d 573, 941 P.2d 752]; *People v. Allison* (1989) 48 Cal.3d 879, 896–898 [258 Cal.Rptr. 208, 771 P.2d 1294].)

Under the evidence, the jury was entitled to reach the following conclusions: The cord found around Mr. Freiri's neck came from the venetian blind in defendant's apartment, and defendant was responsible for bringing it to Mrs. Caton's house. Defendant was also responsible for bringing the knife used to stab Mrs. Caton and Mr. Freiri. Defendant knew his intended victims were elderly and that Mr. Freiri was partially paralyzed, and so he could not have believed he and Cullumber, both younger men, needed the knife to commit the robberies. Therefore, defendant intended to kill, and not just rob, Mrs. Caton and Mr. Freiri. Moreover, defendant knew he could not escape justice if Mr. Freiri were left alive. Defendant had gained entry by saying he needed to use the phone because Cullumber was going to jail. Even if Mr. Freiri did not recognize defendant, he must have known Cullumber, who was an almost daily visitor to his grandmother's home. Mr. Freiri would have led the police to Cullumber, and Cullumber would have led them to defendant.

### c) *Instruction on concurrence of act and specific intent*

Defendant contends the trial court prejudicially erred by failing to instruct the jury that, for purposes of the special circumstances, he had to possess the intent to kill concurrently with his aiding or abetting the actual killings. This contention lacks merit because it rests on the premise we earlier rejected, that the prosecution was required to prove not only that defendant aided or abetted the burglaries and robberies, but also that he aided or abetted the actual killings. (See *ante*, at pp. 900–903.)

The jury was properly instructed on concurrence of act and intent with regard to the special circumstances. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1144 [36 Cal.Rptr.2d 235, 885 P.2d 1].) In accordance with CALJIC No. 3.31, the jury was instructed that, with regard to each of the crimes charged in the information, "there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator. Unless

such specific intent exists, the crime to which it relates is not committed. [¶] The specific intent required is included in the definition of the crimes charged. [¶] All of the special circumstances allegations require an intent to kill."

### 2. *Failure to give the cautionary instruction*

■ When the evidence warrants, the court must instruct the jury sua sponte to view evidence of a defendant's oral admissions or confession with caution. (*People v. Carpenter* (1997) 15 Cal.4th 312, 392 [63 Cal.Rptr.2d 1, 935 P.2d 708] (*Carpenter*); *People v. Bunyard* (1988) 45 Cal.3d 1189, 1224 [249 Cal.Rptr. 71, 756 P.2d 795] (*Bunyard*).)

Failure to give the cautionary instruction here was raised by defendant in his motion for a new trial. The prosecution conceded the error, but contended it was harmless, and the trial court agreed.

■ The standard of review for erroneous failure to give the cautionary instruction is "the normal standard of review for state law error: whether it is reasonably probable the jury would have reached a result more favorable to defendant had the instruction been given. (*People v. Stankewitz* (1990) 51 Cal.3d 72, 94 [270 Cal.Rptr. 817, 793 P.2d 23]; *People v. Beagle* [(1972)] 6 Cal.3d [441,] 456 [99 Cal.Rptr. 313, 492 P.2d 1].) Defendant argues a violation of state law also violates federal due process, thus mandating the more stringent standard for federal constitutional error. He is wrong. Mere instructional error under state law regarding how the jury should consider evidence does not violate the United States Constitution. (*Estelle* v. *McGuire* (1991) 502 U.S. 62, 71–75 [116 L.Ed.2d 385, 112 S.Ct. 475].) Failure to give the cautionary instruction is not one of the " ' "very narrow[]" ' " categories of error that make the trial fundamentally unfair. (*Id.* at p. 73.)" (*Carpenter, supra*, 15 Cal.4th at p. 393.)

It is not reasonably probable the jury would have reached a result more favorable to defendant had the cautionary instruction been given here.

■ " 'The purpose of the cautionary instruction is to assist the jury in determining if the statement was in fact made.' (*People v. Beagle, supra*, 6 Cal.3d at p. 456.)" (*Carpenter, supra*, 15 Cal.4th at p. 393.) "Since the cautionary instruction is intended to help the jury to determine whether the statement attributed to the defendant was in fact made, courts examining the prejudice in failing to give the instruction examine the record to see if there was any conflict in the evidence about the exact words used, their meaning, or whether the admissions were repeated accurately. [Citations.]" (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1268 [278 Cal.Rptr. 640, 805 P.2d 899].)

Where there was no such conflict in the evidence, but simply a denial by the defendant that he made the statements attributed to him, we have found failure to give the cautionary instruction harmless. (*Bunyard, supra,* 45 Cal.3d at pp. 1225–1226.) In *Bunyard,* two witnesses, Popham and Johnson, testified concerning statements made by the defendant in soliciting them to kill his wife. "We agree with the Attorney General that there was no issue of conflicting evidence in this case concerning the precise words used, their meaning or context, or whether the oral admissions were remembered and repeated accurately. (Cf. *People* v. *Bemis* (1949) 33 Cal.2d 395 [202 P.2d 82].) Defendant simply denied soliciting Popham or Johnson to kill his wife. At issue was whether Popham or Johnson were credible witnesses or had fabricated their testimony concerning defendant's solicitations. The jury was properly instructed to view Popham's testimony, as an accomplice, with distrust (CALJIC No. [3:18]), that Johnson's prior felony conviction could be considered in weighing his credibility (CALJIC No. 2.23), and that prior inconsistent statements, inconsistent testimony, feigned loss of memory, and wilfully false testimony would all bear on credibility (CALJIC Nos. 2.13 and 2.21.2). These instructions adequately alerted the jury to view the testimony of Johnson and Popham with caution. We believe that a more favorable result was not reasonably probable absent the error." (*Bunyard, supra,* 45 Cal.3d at pp. 1224–1225.)

As in *Bunyard,* defendant denied making the statements attributed to him, and the question for the jury was whether Buchanan and Goldman were credible witnesses or had fabricated their testimony concerning his admissions to them. And as in *Bunyard,* the court, while neglecting to give the cautionary instruction, did in other respects thoroughly instruct the jury on judging the credibility of witnesses. The jury was instructed on the significance of prior consistent or inconsistent statements of witnesses, discrepancies in a witness's testimony or between his or her testimony and that of others, witnesses who were willfully false in one material part of their testimony being distrusted in other parts, weighing conflicting testimony, evidence of the character of a witness for honesty and truthfulness to be considered in determining the witness's believability, and was given a general instruction on witness credibility that listed other factors to consider, including a witness's bias, interest or other motive, ability to remember the matter in question, and admissions of untruthfulness.

As the Attorney General contends, given these instructions, and given the extensive impeachment of Buchanan and Goldman raising credibility issues

to which the instructions were pertinent,[8] the jury was unquestionably aware their testimony should be viewed with caution.

■ For the same reason, we reject defendant's contention that defense counsel was ineffective in having failed to request the cautionary instruction. The standard for determining ineffective assistance of counsel is well established. A defendant must demonstrate that (1) his attorney's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694 [80 L.Ed.2d 674, 104 S.Ct. 2052] (*Strickland*).) A reasonable probability is a probability sufficient to undermine confidence in the outcome. (*Id.* at p. 694.) Even assuming arguendo that defense counsel's performance, in failing to request the cautionary instruction, fell below an objective standard of reasonableness, it is not reasonably probable that, but for counsel's failure, the result of the trial would have been different.

### 3. *Failure to disclose evidence*

Defendant contends the prosecutor violated his duty under the Fourteenth Amendment's due process clause to disclose evidence to him. (*Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194].)

■ To merit relief on this ground, the evidence a prosecutor failed to disclose must have been both favorable to the defendant and material on either guilt or punishment. Evidence would have been *favorable* if it would have helped the defendant or hurt the prosecution, as by impeaching one of its witnesses. Evidence would have been *material* only if there is a reasonable probability that, had it been disclosed to the defense, the result would have been different. The requisite *reasonable probability* is a probability sufficient to undermine confidence in the outcome on the part of the reviewing court. It

---

[8] The jury knew Goldman and Buchanan were drug addicts, that they had been using drugs almost daily around the time of defendant's statements, and that Buchanan had used drugs the day before his testimony. It knew that, even though he had initially denied it, Buchanan was aware of the $5,000 reward, that Buchanan had told others he wanted the reward for turning defendant in, and that he had then testified the reward was not the reason he had come forward. It knew room and board expenses incurred by Buchanan were to be deducted from the reward. (See *post*, at pp. 909–911.) It knew Buchanan disliked defendant, and that he wanted revenge against defendant for tearing up a picture of his daughter.

The jury also knew Goldman had initially lied to the police, disclaiming any knowledge of the crimes. One witness testified he would not trust Goldman as far as he could throw her. Another witness, a former neighbor, testified Goldman told him she had been called as a witness in a murder case, but that she "didn't know nothing about no murder." Another witness, who testified she was "like a sister" to Goldman, said Goldman told her it was the grandson of the murder victim who had confessed to her.

is a probability assessed by considering the evidence in question under the totality of the relevant circumstances and not in isolation or in the abstract. (*In re Sassounian* (1995) 9 Cal.4th 535, 543–544 [37 Cal.Rptr.2d 446, 887 P.2d 527].)

When Ken Hahus, the prosecutor in this case, first spoke to Buchanan after the case was reassigned to him, Buchanan had been released on his own recognizance (OR) in an unrelated narcotics case and had failed to appear. Barbara Dotta, the prosecutor in the narcotics case, had met with defense counsel in chambers, and after defense counsel had pointed out defects in the search warrant, defects which made it impossible to then proceed with the preliminary hearing, and which eventually resulted in dismissal of that case, Ms. Dotta had agreed to Buchanan's release on OR. However, Buchanan told Mr. Hahus he had been released OR in the narcotics case because he was a prime witness in this case, and that a reporter had been present when counsel met in chambers and reached the purported agreement, but that the reporter had been instructed not to report the agreement, in order to keep defense counsel in this case from learning of it. Mr. Hahus heatedly informed Buchanan no such agreement could have been made because he was the prosecutor in this case, that he would have had to authorize such an agreement, and he had not done so.

Mr. Hahus did not inform defense counsel of his conversation with Buchanan until shortly before the hearing on the motion for a new trial. The motion for new trial was based on other grounds. This contention was not added to the motion, and thus the trial court did not address it.

We conclude that while this information would have been *favorable* to defendant insofar as it tended to impeach Buchanan's credibility, it was *not material* because it would have added little to the cumulative impact of the other impeachment evidence.

The jury knew Buchanan was a drug addict, that he had been using drugs almost daily around the time of defendant's statements, and that he had used drugs the day before his testimony. They knew that, even though he had initially denied it, Buchanan was aware of the $5,000 reward, that Buchanan had told others he wanted the reward for turning defendant in, and that he had then testified the reward was not the reason he had come forward. They knew room and board expenses incurred by Buchanan were to be deducted from the reward. (See *post*, at pp. 909–911.) They knew Buchanan disliked defendant, and that he wanted revenge against defendant for tearing up a picture of his daughter.

It is not reasonably probable, we conclude, that whatever confidence the jury placed in Buchanan's testimony would have been fatally undermined by

knowing he had made a resoundingly unsuccessful effort to convince Mr. Hahus his testimony entitled him to, in Mr. Hahus's words, "get-out-of-jail-free cards."[9]

### 4. *Knowing use of false testimony*

Defendant contends the prosecutor knowingly failed to correct a false impression, created by Buchanan's testimony, that the prosecution had not done Buchanan any favors that might reflect on his credibility.

■ When the prosecution fails to correct testimony of a prosecution witness which it knows or should know is false and misleading, reversal is required if there is *any reasonable likelihood* the false testimony could have affected the judgment of the jury. This standard is functionally equivalent to the " 'harmless beyond a reasonable doubt' " standard of *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. (*In re Jackson* (1992) 3 Cal.4th 578, 597–598 [11 Cal.Rptr.2d 531, 835 P.2d 371].)

We conclude the prosecutor did knowingly fail to correct a false impression—indeed, knowingly exploited the false impression in his argument to the jury—that the prosecution had not done Buchanan any favors that might reflect on his credibility.

The impression was false because a prosecution investigator facilitated an arrangement with the proprietor of a boarding house under which Buchanan received room and board in return for IOU's backed by the reward money he was hoping to receive. However, we conclude that, in light of other information the jury had about Buchanan's arrangement with the proprietor of the boarding house, as well as other indications of his interest in obtaining the reward, the prosecutor's action was harmless beyond a reasonable doubt.

On cross-examination, Buchanan was asked about his contacts with Melvin King, a defense investigator. Buchanan said, among other things, that King bought him lunch, as well as a beer, and "wanted to take me to church and wanted to take me skydiving and stuff like that."

On redirect, the prosecutor asked Buchanan how many times he had spoken to defense investigator King. Buchanan responded he had done so

---

[9] Defendant contends his trial counsel was ineffective in failing to impeach Buchanan with the fact that the charges in the unrelated narcotics case had been dismissed. This information would have been of no impeachment value. After hearing the motion for a new trial, the trial court concluded the narcotics case "was dismissed because of its weakness months before Mr. Buchanan testified. So there was really no favor done to Mr. Buchanan, and there was no further hook on Mr. Buchanan at that time."

perhaps a dozen times, in person or on the phone. The prosecutor asked him what King had bought him. Buchanan said King had bought him lunch, beer on three occasions, and a pair of shoes.

The prosecutor and Buchanan then engaged in the following colloquy. "Q. At any time have you spoken with anybody who's told you they were from my office, from the D.A.'s office? [¶] A. No, sir, only when they've come to pick me up for court. [¶] Q. You've talked to me a couple of times; is that right? [¶] A. Yes, sir. [¶] Q. At any time have the folks who've come to pick you up from my office or me, have we bought you anything? [¶] A. Not a single thing, sir."

In his argument to the jury, the prosecutor sought to exploit the false impression he had created—that unlike the defense, the prosecution had done nothing for Buchanan that might reflect on his credibility. "His statements to Mel King, the only investigator who supplied him with money or alcohol or food was never to back off of his statement that [defendant] made that confession. Now, he's con-wise. 'This guy has taken me out to lunch. This guy is taking me out buying me beer, why kill the goose that's laying the golden egg? You want to hear something, pal, say whatever you want to hear, let's have another Colt 45.' But did he ever, ever back out of that statement?"

As previously stated, the impression was false because a prosecution investigator facilitated an arrangement with the proprietor of a boarding house under which Buchanan received room and board in return for IOU's, amounting to $3,000 or $4,000, backed by the reward money he was hoping to receive. The prosecution investigator even went so far as to draft a document signed by Buchanan under which he agreed the district attorney's office had his permission to discharge his IOU's before he received the remainder of the reward. The prosecutor was aware of this arrangement; he so testified at the hearing on the motion for a new trial.

That said, we conclude there is no reasonable likelihood the false impression created by Buchanan's testimony could have affected the judgment of the jury. While the jury did not know of the role the prosecution investigator played in facilitating the agreement between Buchanan and the proprietor of the boarding house, the jury knew, through Buchanan's testimony and that of the defense investigator, of the agreement itself. They knew, through the defense investigator's testimony, that Buchanan has said on "many" occasions "[h]e was expecting to receive the reward, deduct what money he owed his landlord, buy himself a pickup truck or a car and leave town and start his life over." Finally, they knew through Goldman's testimony that Buchanan had told her "he was going to turn in [defendant] so he could get the reward."

Defendant contends his trial counsel was ineffective in failing to impeach Buchanan with the room and board agreement backed by his IOU's, as well as with the role of the prosecutor's investigator in facilitating the arrangement.[10] However, for the reasons stated, it is not reasonably probable that, but for counsel's inaction, the result of the trial would have been different. (See *Strickland*, *supra*, 466 U.S. at p. 694.)

### 5. *Reference to section 128*

Defendant contends reference to section 128 by the court and prosecutor constituted prejudicial error. The contention lacks merit. (*Harris*, *supra*, 47 Cal.3d at p. 1083, fn. 17.)

Section 128 provides: "Every person who, by willful perjury or subornation of perjury procures the conviction and execution of any innocent person, is punishable by death or life imprisonment without possibility of parole. The penalty shall be determined pursuant to Sections 190.3 and 190.4."

On redirect, the prosecutor asked Buchanan whether he recalled being informed by the prosecutor of a Penal Code section dealing with testimony in a capital case. Buchanan responded, "Oh, yes, sir, yes; definitely remember that one." Defense counsel objected, without specifying any ground. Outside the presence of the jury, the prosecutor supported the propriety of this line of questioning by citing *Harris*, *supra*, 47 Cal.3d 1047.

In *Harris*, the defendant claimed "the prosecutor . . . improperly attempted to establish [a witness's] credibility by eliciting testimony that [the witness] was aware of Penal Code section 128, and that the section provided for the death penalty for a witness who gave perjured testimony leading to a conviction in a capital case. Again, there was no objection, *and the question was proper*." (*Harris*, *supra*, 47 Cal.3d at p. 1083, fn. 17, italics added.)

After he had an opportunity, along with the court, to read *Harris*, defense counsel did not renew his objection. Rather, he said the prosecutor should be limited to asking Buchanan whether he was "aware" of section 128. The prosecutor so confined his query, and after Buchanan again testified he was aware of the section, the court read it to the jury. Finally, during his closing argument, the prosecutor asked the jury, "Do you think Gene Buchanan would lie to send a man to prison? Perhaps. Do you think Gene Buchanan would lie to send a man to prison that he doesn't like? Even more perhaps. Do you think that Gene Buchanan would lie to send a man to prison behind a murder charge where Gene Buchanan himself could face a capital case for it?"

---

[10] Defense counsel knew of the arrangement.

Defendant argues section 128 is not a meaningful deterrent to perjury. "Given the inevitable time lapse between potential conviction and execution, and the remote prospect of conclusive exonerating evidence being discovered after an execution, the chances of a successful prosecution under Penal Code section 128 in any case are so remote as to make the proffered evidence wholly irrelevant."

We decline to second-guess the Legislature, which in enacting the section, clearly believed it would have a meaningful deterrent effect. Admittedly, the delay between conviction and execution has grown exponentially since section 128 was enacted in 1872. However, by 1997, when the Legislature amended and thereby reaffirmed the section,[11] the notion of swift justice in capital cases was already a thing of the past. Moreover, with the advent of DNA testing, "the prospect of conclusive exonerating evidence being discovered after an execution" is, if anything, less "remote." In any event, the stakes under section 128, "death or life imprisonment without possibility of parole," are so high a potential perjurer may well decide it is not worth the risk, however small.

Finally, since it was proper for the prosecutor to ask Buchanan whether he had been made aware of section 128, defense counsel was not ineffective insofar as he failed to perfect his objections to this line of inquiry.

### 6. *Allegedly inadmissible character evidence*

Defendant contends his trial counsel was ineffective in failing to object to testimony by Gail Goldman, "[t]he only possible relevance of [which] was to prove that [defendant] was a likely participant in the murders as a result of his violent and deadly traits." The contention lacks merit.

As previously stated, because she died before the trial began, Goldman's preliminary hearing testimony was read into the record. (Evid. Code, § 240, subd. (a)(3).) The testimony by Goldman that defendant now complains of was that defendant "was not afraid of anyone," "would strike like a cobra," and had once hit a karate expert who was threatening him "so fast I couldn't believe it." Defendant contends Goldman's testimony was inadmissible character evidence offered to prove he committed the murders. (See Evid. Code, § 1101, subd. (a).) However, her testimony must be placed in context. Shortly before, Goldman had testified, in response to the prosecutor's question, that she wanted to make sure defendant knew she was not the person who turned him in.

---

[11] The 1977 amendment added the phrase "or life imprisonment without possibility of parole," as well as the second sentence. (Stats. 1977, ch. 316, § 3, p. 1256.)

"Generally, evidence that a witness is afraid to testify is admissible as relevant to the witness's credibility. (Evid. Code, § 780; *People v. Warren* (1988) 45 Cal.3d 471, 481 [247 Cal.Rptr. 172, 754 P.2d 218].)" (*People v. Sapp* (2003) 31 Cal.4th 240, 301 [2 Cal.Rptr.3d 554, 73 P.3d 433].) In apparent recognition of this rule, defendant does not complain of Goldman's earlier testimony that she was afraid defendant might "do something to [her] if [she] talked to the police," nor does he complain of Detective Stokes's subsequent testimony that Goldman told him defendant "had said he would kill her if she or anyone else talked about what he had told [her and Buchanan]." The testimony defendant does complain of simply went to Goldman's belief that defendant was capable of carrying out his threats of retaliation.

Defendant complains his trial counsel was also ineffective in failing to object to testimony by Goldman concerning Cullumber. Goldman testified, in response to leading questions from the prosecutor, that Cullumber was not "mean" or "violent," did not have a "temper," but rather was "a very funny person" who "kept [her] laughing all the time." This testimony, defendant asserts, "fell squarely into the proscription of Evidence Code section 1101, subd. (a), as it was offered to prove that someone else was the likely source of the apparent malevolent intent and murderous acts in question."

It is not apparent what legitimate purpose the prosecutor could have had in eliciting this testimony from Goldman concerning Cullumber's benign character. The Attorney General suggests none. However, neither is it apparent that defense counsel was ineffective in failing to object to it.

Again, to establish ineffective assistance of counsel, a defendant must demonstrate his attorney's performance fell below an objective standard of reasonableness, and there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*Strickland*, *supra*, 466 U.S. at pp. 688, 694.) A reasonable probability is a probability sufficient to undermine confidence in the outcome. (*Ibid.*) We do not find it reasonably probable the outcome here would have been different in the absence of this testimony.

### 7. *Alleged vouching for a witness*

Defendant contends the prosecutor committed prejudicial misconduct by vouching for the credibility of Gene Buchanan.

"A prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record. . . . However, so long as a prosecutor's

assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' her comments cannot be characterized as improper vouching. [Citations.]" (*People v. Frye* (1998) 18 Cal.4th 894, 971 [77 Cal.Rptr.2d 25, 959 P.2d 183].)

The conduct defendant complains of occurred as the prosecutor, in his argument to the jury, acknowledged and sought to dispel any doubts they may have had regarding Buchanan's credibility. "He's a drug addict, street-wise, and he's con-wise and he doesn't work . . . . [¶] . . . But that doesn't mean that the truth cannot come out of the mouth of a drug addict. It can come out of the mouth of a drug addict just as well as it can come out of the mouth of a priest. No priests lived at that Harvard address, only drug addicts. This murder was committed in hell. We don't have angels for witnesses, we've people that live in hell. [¶] But do you think Gene Buchanan would lie for $5,000? Maybe. Do you think Gene Buchanan would lie to send a man to prison? *I don't think so.*"

■ We need not decide whether the prosecutor's comment amounted to improper vouching because defense counsel objected to the comment, the objection was sustained, and the court admonished the jury: "That's an improper argument, ladies and gentlemen, [the prosecutor] has stated his personal opinion. You are to ignore that statement, please." We presume the jury heeded the admonition and that any error was cured. (*People v. Burgener* (2003) 29 Cal.4th 833, 874 [129 Cal.Rptr.2d 747, 62 P.3d 1] (*Burgener*); *People v. Jones* (1997) 15 Cal.4th 119, 168 [61 Cal.Rptr.2d 386, 931 P.2d 960]; *People v. Wash* (1993) 6 Cal.4th 215, 263 [24 Cal.Rptr.2d 421, 861 P.2d 1107].)

### 8. *Failure to object to prosecutor's closing argument*

Defendant claims the prosecutor, in his closing argument to the jury in the guilt phase of the trial, made two "misstatements amounting to misconduct." His counsel's failure to perfect objections to these instances of alleged misconduct, defendant contends, constituted ineffective assistance.

■ "As we have noted repeatedly, the mere failure to object rarely rises to a level implicating one's constitutional right to effective legal counsel. (*People v. Williams* (1997) 16 Cal.4th 153, 221 [66 Cal.Rptr.2d 123, 940 P.2d 710].)" (*People v. Boyette* (2002) 29 Cal.4th 381, 433 [127 Cal.Rptr.2d 544, 58 P.3d 391].)

With regard to the first instance of alleged misconduct by the prosecutor, defense counsel did object, and the objection was sustained, and so ineffective assistance cannot be claimed. As to the second, we find no misconduct.

The prosecutor, defendant complains, "took on the role of an unsworn forensics expert in constructing an unreasonable inference that a single fingerprint [belonging to defendant] found on a blind accessible to everyone at the apartment before and after the incident implied some form of special handling by the owner of the print that could only be explained by the act of cutting a cord from the blind. Since there obviously was no expert testimony to support this contrived inference, the argument constituted statements of supposed facts not in evidence, to which counsel failed to object."

In his argument, defense counsel acknowledged that defendant's fingerprint was on one of the slats of the venetian blind. He then raised the question why the fingerprints of others who had handled the blind, including Cullumber and a Jerry Lilliard, were not. "[S]omething to consider," he said.

The prosecutor responded, "[D]efense counsel points out that neither Jerry's fingerprint nor R.C.'s fingerprint was found on there. I submit to you, all they did was pick it up. They didn't have to hold it securely while the cord was cut from it. They didn't have to apply pressure to it. They didn't have to hold it immobile while the cord was being cut from it. That will explain the pressure that results in the oils being left that results in a latent being lifted, that results in finding it was his fingerprint, and not simply being picked up off the floor because it fell off the door. If that's all that happened wouldn't there have been other prints on it?"

██ It is well settled that a prosecutor is given wide latitude during argument. The scope of this latitude includes stating matters not in evidence, but which are common knowledge. (*People v. Williams, supra,* 16 Cal.4th at p. 221; *People v. Wharton* (1991) 53 Cal.3d 522, 567 [280 Cal.Rptr. 631, 809 P.2d 290].) It is a matter of common knowledge that, assuming an object is of the sort that takes fingerprints, and that one is barehanded, the harder one presses on it with one's fingers, the more likely one is to leave a fingerprint. Therefore, the prosecutor's argument was not misconduct, and, a fortiori, it was not ineffective assistance for defense counsel not to object it. In any event, the jury was instructed that statements made by counsel were not evidence, and that they were to reject interpretations of the evidence they found to be unreasonable.

### 9. *Cumulative error*

Defendant contends "the cumulative effect of numerous errors occurring during the guilt phase compels reversal." The contention has no merit.

B. *Penalty Phase Issues*

1. *Reaction by victim's family to jury verdicts*

Defendant contends the trial court "prejudicially erred by denying [his] motion to discharge the jury based on the emotional outburst of the victims' families in favorable response to the rendition of the guilty verdict." This contention lacks merit.

At the conclusion of the guilt phase of the trial, when the jury's verdicts and findings were read in open court, Lavelle Garratt, the daughter of victim Marie Caton, said in a loud voice, "Yes, yes." The court admonished her to "[k]eep it down, ma'am"; and the prosecutor also loudly instructed her to remain silent. Other members of Mrs. Caton's family embraced one another, cried, and whispered among themselves.

The following week defense counsel moved to discharge the jury on the ground it had been exposed to constitutionally impermissible victim impact evidence under *Booth v. Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529]. In denying the motion, the court expressed doubt as to whether any prejudice occurred, but offered to admonish the jury to disregard the outburst and not let it influence their penalty deliberations, unless the defense preferred that an admonition not be given, as it might serve to highlight the incident in the minds of the jurors. Defense counsel said he would have to decide whether to ask for such an admonition. As it turned out, no admonition was given. While the record does not reflect whether defense counsel expressly declined the court's offer, it strongly suggests he did. The next day the court stated that "some matters had been discussed in chambers and we've gone over" the penalty phase instructions. After the court listed the instructions it intended to give, it asked whether either counsel wanted other instructions. Defense counsel stated, "I have no other requests." Earlier, defense counsel had stated he felt no admonition could be effective—that the proverbial bell could not be unrung.

Assuming arguendo an admonition would have cured any prejudice, defendant contends his trial counsel was ineffective in failing to request an admonition. Again, we disagree.

■ The brief, spontaneous reaction of the members of Marie Caton's family to the jury verdicts did not constitute victim impact *evidence* of the sort proscribed in *Booth v. Maryland, supra,* 482 U.S. 496. Moreover, while this case has been on appeal, the United States Supreme Court, partially overruling *Booth* and *South Carolina v. Gathers* (1989) 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2207], held that "[i]n a capital trial, evidence showing

the direct impact of the defendant's acts on the victims' friends and family is not barred by the Eighth or Fourteenth Amendments to the federal Constitution. (*Payne v. Tennessee* (1991) 501 U.S. 808, 825–827 [115 L.Ed.2d 720, 111 S.Ct. 2597].)" (*People v. Pollock* (2004) 32 Cal.4th 1153, 1180 [13 Cal.Rptr.3d 34, 89 P.3d 353].) *Payne* applies retroactively. (*People v. Clair* (1992) 2 Cal.4th 629, 672 [7 Cal.Rptr.2d 564, 828 P.2d 705] (*Clair*).)

 "Under California law, victim impact evidence is admissible at the penalty phase under section 190.3, factor (a), as a circumstance of the crime, provided the evidence is not so inflammatory as to elicit from the jury an irrational or emotional response untethered to the facts of the case. (*People v. Boyette, supra,* 29 Cal.4th at p. 444; *People v. Edwards* (1991) 54 Cal.3d 787, 835–836 [1 Cal.Rptr.2d 696, 819 P.2d 436].)" (*People v. Pollock, supra,* 32 Cal.4th at p. 1180.) It would come as no surprise to a jury that a victim's family was anguished by her murder, relieved that part of the trial was over, and satisfied with the guilty verdicts. The relatively muted reaction of Marie Caton's family to the jury verdicts was certainly not "so inflammatory as to elicit from the jury an irrational or emotional response untethered to the facts of the case." (*Ibid.*) Finally, defense counsel may have made a reasonable tactical decision that an admonition was not, on balance, desirable, because it would remind the jury of the incident.

### 2. *Alleged* Marsden *error*

 "In [*People v.*] Marsden[(1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]], we said: '[A] judge who denies a motion for substitution of attorneys solely on the basis of his courtroom observations, despite a defendant's offer to relate specific instances of misconduct, abuses the exercise of his discretion to determine the competency of the attorney. A judicial decision made without giving a party an opportunity to present argument or evidence in support of his contention "is lacking in all the attributes of a judicial determination." (*Spector v. Superior Court* (1961) 55 Cal.2d 839, 843 [13 Cal.Rptr. 189, 361 P.2d 909].)' (*Marsden, supra,* 2 Cal.3d at p. 124.)" (*People v. Jones* (2003) 29 Cal.4th 1229, 1244 [131 Cal.Rptr.2d 468, 64 P.3d 762].)

 "A defendant is entitled to have appointed counsel discharged upon a showing that counsel is not providing adequate representation or that counsel and defendant have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result. (*People v. Earp* (1999) 20 Cal.4th 826, 876 [85 Cal.Rptr.2d 857, 978 P.2d 15] (*Earp*); *People v. Memro* (1995) 11 Cal.4th 786, 857 [47 Cal.Rptr.2d 219, 905 P.2d 1305] (*Memro*).)" (*People v. Jones, supra,* 29 Cal.4th at pp. 1244–1245.)

Defendant contends that, following the guilt phase of the trial, he sought to make a motion for the appointment of different counsel to assist him in the penalty phase, and the court, without conducting the hearing required by *Marsden*, prejudicially erred by declining to rule on his motion until the penalty phase was concluded.

The Attorney General responds that defendant was not making a motion for the appointment of substitute counsel to represent him in the penalty phase. Rather, the Attorney General contends, defendant moved for the appointment of *separate* counsel for the purposes of preparing a *motion for a new trial* based on, among other grounds, incompetence of counsel during the guilt phase. Once the court ascertained that defendant was seeking the appointment of separate counsel to prepare a new trial motion, the Attorney General argues, the court properly declined to rule on it until the trial was over, at which time separate counsel for that purpose was appointed.

While the matter is not entirely free from doubt, doubt engendered largely by the court's confused and confusing references to *Marsden*, we agree with the Attorney General's characterization of defendant's motion.

Defendant's trial counsel, Marvin F. Schultz, clearly framed the matter as, not a motion for substitute counsel to represent defendant in the penalty phase, but rather as a motion for the appointment of separate counsel to represent defendant in the preparation of a motion for a new trial, which motion, counsel said, was likely to include, among other grounds, allegations that he acted incompetently in the guilt phase. The disagreements between defendant and himself, counsel said, regarded "trial tactic decisions that were made on witnesses who were called and not called and the way some things were presented." The idea for the appointment of separate counsel for this limited purpose, according to counsel, was his, not defendant's.[12]

---

[12] "MR. SCHULTZ: I have explained to Mr. Dickey the ground—the types of things that could be presented to the Court as part of *a motion for a new trial* when the time is appropriate for that motion, and that there are some disagreements between Mr. Dickey and I as to some trial tactic decisions that were made on witnesses who were called and not called and the way some things in the case were presented.

"In terms of including in *a motion for new trial* any issues of incompetency of counsel I advised Mr. Dickey that, obviously, I think my decisions were correct. And I understand why he would disagree with that. But in terms of being able to present that issue as *a motion for a new trial*, it was my advice to Mr. Dickey that the request should be made to the Court for an attorney to—a separate attorney to review the record, considering we do have an existing transcript that somebody can review at this point, and determine whether or not he can consult with that attorney on the issues that he disagreed with me on, to determine whether or not there was a legitimate basis or any basis for making *a motion for new trial* based on incompetence of counsel.

"And I was concerned when Mr. Dickey presented the request to the Court that it would include conversations that we had discussing the trial tactics and witnesses and things might

The court asked defense counsel when defendant wished the matter to be heard. Counsel responded, "Well, my understanding procedurally is that the motion for new trial would have to wait until after the penalty phase." The court replied, "That was my thinking."

The court then addressed defendant. It referred to *Marsden*, and it stated, incorrectly, that *Marsden* hearings are not to be conducted "in the middle of a trial." (Cf. *Memro, supra,* 11 Cal.4th at p. 856 [the defendant made several *Marsden* motions, including one just before the penalty trial began].) However, the court added, "I'll hear whatever you have to say. I may have to tell you at the end of the statement that this is not the time to get into that, but I don't know until I hear you out."[13] The following colloquy ensued.

"THE DEFENDANT: Well, if this is not the time then this is not the time.

"THE COURT: I can't tell. See, you apparently want to make some statements concerning what you believe to be—I don't know, unwise choice[s] on the part of Mr. Schultz concerning calling witnesses, questions asked of them. I don't know what you're getting to. That would be the sort of thing we'd want to hear after the trial is over with, and before sentencing.

"THE DEFENDANT: Yes, I'm not satisfied with the competency of my attorney. There are witnesses that are—that were available that [were] not called that I feel [were] crucial to my defense, and issues that were not raised that I feel [were] crucial, and questions that [were] not asked of me while I was on the stand that should have been raised.

"THE COURT: That sounds like the sort of thing that you'd want to raise after—before sentencing rather than at this time.

"THE DEFENDANT: Okay, I'll leave that to your discretion, you know.

come up. And I thought it was—it's not really a pure *Marsden* hearing, but there are obviously disagreements as to tactics. And I think the only way that I can think of to resolve that issue was to have Mr. Dickey request of the Court that the transcripts be reviewed by a separate attorney to determine whether or not there's basis for the *motion for new trial* on the incompetency issue." (Italics added.)

[13] "THE COURT: Mr. Dickey, we don't constantly have *Marsden* hearings during the course of a trial. We normally will hear a *Marsden* motion preceding the trial if the issue arises. And the trial is had, and if there's a subsequent—not a *Marsden* motion—well, you could have a *Marsden* motion before sentencing if—once we get to that stage. But we don't do it in the middle of a trial. And we still are—we're not through with your case, we still have the second part, the penalty phase, to get out of the way, if we get to that. I've been advised there are some motions counsel want[s] to make before we get to the penalty phase. So I'll have to hear them out and determine whether or not this is a case where we are going to get to the penalty phase.

"I'll hear whatever you have to say. I may have to tell you at the end of the statement that this is not the time to get into that, but I don't know until I hear you out."

"THE COURT: From what you've just stated, that seems like the sort of thing you'd want to discuss then.

"THE DEFENDANT: *There's other issues of motions for new trial other than that. But I don't believe this is the appropriate time.*

"THE COURT: Once we get to the end of the trial, a transcript will be provided to another attorney, to review the case and determine whether or not he feels there's grounds for new trial based on incompetency of counsel. We have to be through with the trial.

"THE DEFENDANT: Yes." (Italics added.)

The court did appoint separate counsel, Katherine Hart, to assist defendant in the preparation of a motion for a new trial. Ms. Hart's new trial motion, which was heard following the penalty phase of the trial, was based on the grounds, among others, that (1) defendant's trial counsel, Mr. Schultz, was ineffective in the guilt phase, and (2) the court erred in failing to conduct a *Marsden* hearing following the guilt phase.

The new trial motion was denied. As to defendant's *Marsden* claim, the court said, "I think at the time you were arguing this, that in my view there was a poor choice of words on the Court's part. I know Mr. Schultz let me know that it was not strictly a *Marsden* motion, and then I started to talking about a *Marsden* motion. And I do, of course, know the law, that you can have a *Marsden* motion at any stage of the proceedings. [¶] Mr. Dickey was not asking that the Court have that *Marsden* hearing. He, of course, was dissatisfied with the results after the jury returned the verdict of guilty and found the special circumstances to be true. [¶] So I do find that [the prosecutor] is absolutely correct, it was a poor choice of words on the Court's part, and there was no reason to have a *Marsden* hearing at the time. It was not asked for."

 We conclude the court did not commit *Marsden* error. " 'Although no formal motion is necessary, there must be "at least some clear indication by defendant that he wants a substitute attorney." ' (*People v. Mendoza* (2000) 24 Cal.4th 130, 157 [99 Cal.Rptr.2d 485, 6 P.3d 150], quoting *People v. Lucky* (1988) 45 Cal.3d 259, 281, fn. 8 [247 Cal.Rptr. 1, 753 P.2d 1052].)" (*People v. Valdez* (2004) 32 Cal.4th 73, 97 [8 Cal.Rptr.3d 271, 82 P.3d 296].) Defendant did *not* clearly indicate he wanted substitute counsel appointed for the penalty phase. To the extent he made his wishes known, he wanted to use counsel's assertedly incompetent performance in the guilt phase as one of the bases of a motion for new trial, and he wanted to have separate counsel

appointed to represent him in the preparation of such a motion. As his expressed wishes were honored, he has no grounds for complaint now.[14]

Moreover, it is clear a *Marsden* motion would have been baseless.

Again, in his colloquy with the court at the time he made the motion, defendant stated, "There are witnesses that are—that were available that [were] not called that I feel [were] crucial to my defense, and issues that were not raised that I feel [were] crucial, and questions that [were] not asked of me while I was on the stand that should have been raised."

The one point in Ms. Hart's new trial motion that appears relevant to these complaints is her claim that Mr. Schultz failed to accede to defendant's request that he present a defense of "third-party culpability," i.e., that Gene Buchanan was "the real perpetrator."[15] "Buchanan disappeared right after the crime, and Buchanan's truck, which he owned with Gail Goldman, was abandoned. The truck was later located by the repossessor. After R.C. committed suicide, Buchanan reappeared. Buchanan's disappearance was unusual, because Buchanan had lived with Goldman for five years, and during the time defendant was residing with Goldman and Buchanan, Buchanan did not disappear for days at a time. Defendant's theory is that Buchanan was the real perpetrator, that Buchanan had the same motive to commit the killing as the prosecution imputed to defendant (that is, a motive to rob or steal to obtain money for drugs), that Buchanan disappeared right after the crime because he was guilty of the crime and wished to avoid detection, and reemerged once R.C.'s suicide was publicized."

In a preface to this portion of her written motion, Ms. Hart stated, "Defendant requests a separate hearing on this issue only if his motion for new trial on the basis of the actual record is denied. That is, there will be no need to conduct a separate, detailed hearing on the issue of whether his defense was appropriately presented if his motion for new trial is granted on other grounds. Also, at the time this motion was being prepared, defendant was still investigating facts supporting the claim of third-party culpability. . . . Defendant expects to present, at the hearing on third-party culpability, declarations and witnesses not available for submission at the time this motion was filed."

---

[14] Defendant contends his comments the following day, when he stated he did not wish to be present in the courtroom during the penalty phase, manifested an irreconcilable conflict with counsel. We disagree. Defendant's remarks suggested he had lost confidence, not in counsel, but in the jury. "I would just as soon that the defense not even say nothing, just rest. I don't intend to plead nothing to the jury. I'd just as soon sit in the cell. I have no intentions or desire to try to have any sympathy or pity from the jury that convicted me of these crimes. I don't intend to be present, neither; I don't wish to be."

[15] Whether defendant was claiming Buchanan was the lone killer or Cullumber's accomplice is not clear from Ms. Hart's moving papers.

Ms. Hart was appointed on March 26, 1991. She filed the motion for new trial almost five months later, on August 16, 1991. The hearing on the motion was held five months after that, on January 17, 1992. At the hearing, the court stated it had been informed by Ms. Hart she was not abandoning the contention that Buchanan was the killer, but that she had nothing further to present to support the theory.

In denying the new trial motion, the court observed there did not appear to have been "sufficient evidence available to Mr. Schultz to present a credible theory that Mr. Buchanan would have been the person who went with RC that night and who was responsible for the killing. [¶] So I don't find that there was any error on Mr. Schultz's part in failing to present this theory, and that it was not ineffective assistance of counsel to fail to do that."

 We do not find *Marsden* error where complaints of counsel's inadequacy involve tactical disagreements. (*People v. Cole* (2004) 33 Cal.4th 1158, 1192 [17 Cal.Rptr.3d 532, 95 P.3d 811]; *People v. Welch* (1999) 20 Cal.4th 701, 728–729 [85 Cal.Rptr.2d 203, 976 P.2d 754] (*Welch*); *People v. Barnett* (1998) 17 Cal.4th 1044, 1107, fn. 37 [74 Cal.Rptr.2d 121, 954 P.2d 384].) The conflict between defendant and counsel, over whether defendant's theory that Buchanan was the real killer should have been presented to the jury, was a tactical disagreement, and in the apparent absence of any evidence supporting the theory, a disagreement in which counsel seems to have taken the wiser view.

### 3. *Defendant's absence during penalty phase*

At his request and pursuant to his written waiver, defendant absented himself from the courtroom during the penalty phase of the trial and observed the proceedings on a television monitor in the holding cell. Defendant now contends his absence violated the federal Constitution and sections 977 and 1043. We conclude defendant validly waived his constitutional right to be present, and although sections 977 and 1043 were violated, the error was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].

Before the penalty phase began, defense counsel informed the court defendant did not wish to be in the courtroom during the proceeding. Counsel advised the court he had discussed the issue with defendant, and that he did not oppose defendant's wishes in this regard. He observed, "with the video setup that's available in the holding area, obviously there's no confrontation issue."

The court confirmed "we have a holding cell right next to this courtroom, we have a TV monitor in there . . . so that you will both be able to see and

hear what is going on in this courtroom." While stating he was prepared to comply with defendant's wish to be absent, the court advised defendant "it would probably be wiser to be in the courtroom during the taking of the testimony," and if defendant changed his mind at any time, "we'll bring you back immediately."

Defendant responded, "I would just as soon that the defense not even say nothing, just rest. I don't intend to plead nothing to the jury. I'd just as soon sit in the cell. I have no intentions or desire to try to have any sympathy or pity from the jury that convicted me of these crimes. I don't intend to be present, neither; I don't wish to be."

Having readvised defendant of his confrontation and cross-examination rights, the court took an oral waiver in which defendant confirmed he understood his right to be present, that he was voluntarily asking to absent himself, and that he understood he could return to the courtroom "anytime you want to come back." The oral waiver was confirmed in a written waiver signed in open court after defendant himself actively participated in its wording.

 A defendant has the right, under the Sixth Amendment of the federal Constitution, to be present at trial during the taking of evidence. Nonetheless, as a matter of both federal and state constitutional law, a capital defendant may validly waive his presence at critical stages of the trial. (*People v. Weaver* (2001) 26 Cal.4th 876, 966 [111 Cal.Rptr.2d 2, 29 P.3d 103] (*Weaver*); *People v. Jackson* (1996) 13 Cal.4th 1164, 1209–1210 [56 Cal.Rptr.2d 49, 920 P.2d 1254] (*Jackson*).) Defendant's waiver was valid; accordingly, his constitutional rights were not violated.

 A capital defendant cannot voluntarily waive his rights under sections 977 and 1043 to be present at trial. (*Weaver*, *supra*, 26 Cal.4th at pp. 967–968; *Jackson*, *supra*, 13 Cal.4th at p. 1210.) However, permitting defendant to waive those rights was merely statutory error, and thus we should reverse the judgment on this ground only if we conclude the error was prejudicial. (*Weaver*, at p. 968; *Jackson*, at p. 1211.) The standard for reviewing error in permitting a defendant to absent himself from the *penalty* phase of a capital case is whether there is a " 'reasonable *possibility*' " the jury would have reached a different result had the error not occurred. (*People v. Hernandez* (2003) 30 Cal.4th 835, 877 [134 Cal.Rptr.2d 602, 69 P.3d 446], italics added; see *People v. Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135].) *Weaver* and *Jackson* were also capital cases, and we used the reasonable *probability* standard in those cases. (*Weaver*, at p. 968; *Jackson*, at p. 1211.) However, the error in *Weaver* occurred in the sanity phase of the trial (*Weaver*, at p. 965), and in the guilt phase in *Jackson* (*Jackson*, at p. 1209).

We conclude it is not reasonably possible a result more favorable to defendant would have been reached in the absence of the error. First, the television monitor in the holding room enabled defendant to see and hear the proceedings, and the court made it clear defendant would be brought back into the courtroom the moment defendant decided he wanted to return. Second, the only witness who testified during the penalty phase was the detective who provided the foundation for the admission of the autopsy photographs of the victims. The admissibility of the autopsy photographs had already been vigorously contested by defense counsel, and it is not apparent what value defendant's presence during the detective's testimony would have been to defense counsel. (See *Weaver, supra,* 26 Cal.4th at p. 968.) Third, given defendant's professed lack of any desire to receive "sympathy or pity from that jury that convicted me of these crimes," his demeanor, had he been present in the courtroom, might have undermined his counsel's argument. Finally, the court advised the jury that defendant had exercised his option of not being present, but that he was following the proceedings on a television screen in the holding cell, and that they were not to consider his absence in their deliberations.

4. *Autopsy photographs*

Defendant contends the trial court prejudicially erred in admitting autopsy photographs of the victims. The contention lacks merit.

■ "We repeatedly have determined that photographs of victims' bodies may be admissible at the penalty phase to demonstrate graphically the circumstances of the crime, a factor relevant to the issues of aggravation and penalty. (E.g., *People v. Lucas* [(1995)] 12 Cal.4th [415,] 490 [48 Cal.Rptr.2d 525, 907 P.2d 373]; *People v. Sanchez* (1995) 12 Cal.4th 1, 63–65 [47 Cal.Rptr.2d 843, 906 P.2d 1129]; *People v. Medina* (1995) 11 Cal.4th 694, 775 [47 Cal.Rptr.2d 165, 906 P.2d 2]; *People v. Wader* (1993) 5 Cal.4th 610, 655 [20 Cal.Rptr.2d 788, 854 P.2d 80]; *People v. Raley* (1992) 2 Cal.4th 870, 914 [8 Cal.Rptr.2d 678, 830 P.2d 712]; *People v. Hardy* (1992) 2 Cal.4th 86, 199–200 [5 Cal.Rptr.2d 796, 825 P.2d 781].)" (*People v. Smithey* (1999) 20 Cal.4th 936, 990 [86 Cal.Rptr.2d 243, 978 P.2d 1171].)

■ Defendant contends the photographs should not have been admitted against him because he was merely an aider and abettor. However, we have upheld the admission of autopsy photographs in the penalty phase of the trial of a defendant convicted on an aiding and abetting theory. (*People v. Sanchez, supra,* 12 Cal.4th at pp. 63–65.) Defendant notes there was more evidence in *Sanchez* of the defendant's direct involvement in the murderous acts. (*Id.* at p. 22.) That is beside the point. The "circumstances of the crime of which the defendant was convicted in the present proceeding" (§ 190.3,

factor (a)), which include the brutality of its commission, and whether the defendant's "participation in the commission of the offense was relatively minor" (§ 190.3, factor (j)) are separate sentencing factors. The circumstances of the offense here, as evidenced by the photographs of the victims, were arguably an aggravating factor, and the prosecutor made that argument. The nature of defendant's involvement, that he was an aider and abettor, was arguably a mitigating factor, and defense counsel made that argument. The jury was properly instructed. No error appears.

### 5. *Ineffective assistance of counsel*

■ "At the penalty phase as at the guilt trial, defendant bears the burden of showing ineffective assistance. He must show (1) deficient performance under an objective standard of professional reasonableness, and (2) prejudice under a test of reasonable probability. (*In re Marquez* (1992) 1 Cal.4th 584, 602–603 [3 Cal.Rptr.2d 727, 822 P.2d 435].)" (*People v. Mayfield* (1993) 5 Cal.4th 142, 185 [19 Cal.Rptr.2d 836, 852 P.2d 331] (*Mayfield*).) Prejudice is established when there is a reasonable probability that, absent the errors of counsel, the sentencer would have concluded the balance of aggravating and mitigating circumstances did not warrant death. As in the guilt phase, reasonable probability is defined as one that undermines confidence in the verdict. (*In re Gay* (1998) 19 Cal.4th 771, 790 [80 Cal.Rptr.2d 765, 968 P.2d 476]; *In re Marquez*, at p. 606.)

■ "In measuring counsel's performance, the United States Supreme Court has cautioned that judicial scrutiny 'must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." [Citation.] There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.' (*Strickland, supra,* 466 U.S. at p. 689; *Bell v. Cone* (2002) 535 U.S. 685 [152 L.Ed.2d 914, 122 S.Ct. 1843].) The high court has also expressly reaffirmed that the *Strickland* standard applies to an assessment of counsel's 'failure to adduce mitigating evidence and the waiver of closing

argument' with respect to capital sentencing. (*Bell v. Cone*, at pp. 696–699.)" (*In re Andrews* (2002) 28 Cal.4th 1234, 1253–1254 [124 Cal.Rptr.2d 473, 52 P.3d 656].)

### a) *Failure to present mitigating evidence*

Defendant contends he received ineffective assistance of counsel because counsel presented no mitigating evidence in the penalty phase.

■■■ "On a silent record . . . we will not assume that the defense counsel's failure to present mitigating evidence rendered his assistance ineffective. Any assertion that counsel was inadequate in this regard must be raised on habeas corpus." (*People v. Diaz* (1992) 3 Cal.4th 495, 566 [11 Cal.Rptr.2d 353, 834 P.2d 1171] (*Diaz*); see *People v. Anderson* (2001) 25 Cal.4th 543, 598 [106 Cal.Rptr.2d 575, 22 P.3d 347].)

The record is not silent here. However, insofar as it speaks, it undercuts defendant's ineffectiveness claim.

Defendant contends his mother should have been called to testify as to the "awful conditions of [his] upbringing." A declaration by defendant's mother was attached to the motion for a new trial filed by defendant's new counsel appointed for the purpose of preparing the motion. In the declaration, defendant's mother states she had been available to testify that when defendant was growing up he "suffered abusive beatings" by his father, and that at times she had taken out her "rage" on defendant, beating him with a belt.

Prior to the penalty phase, defense counsel discussed with the court his concern that such "abuse" could be viewed as harsh punishment, raising the question, on rebuttal, whether defendant had done something to provoke such punishment. This was a concern because defendant had, indeed, done something deserving of severe punishment—he had sexually molested his little sister. The abuse occurred over a period of two years, starting when defendant was 12 and his sister was only five.[16] Noting such rebuttal would be "devastating," defense counsel said he would have to decide whether the risk was too great. In the end, defense counsel called neither defendant's mother nor any other witness.

■■■ When defense counsel's reasons are not readily apparent from the record, we will not assume he was ineffective unless his challenged conduct

---

[16] In her declaration filed in support of defendant's new trial motion, defendant's mother acknowledged defendant was "accused" of molesting his sister, but stated she "had no personal knowledge" of it. However, the probation report reveals defendant was adjudged guilty of the conduct by a juvenile court.

could have had " ' "no conceivable tactical purpose." ' " (*Earp, supra,* 20 Cal.4th at p. 896; see *People v. Hines* (1997) 15 Cal.4th 997, 1065 [64 Cal.Rptr.2d 594, 938 P.2d 388]; *Diaz, supra,* 3 Cal.4th at p. 558.) Here, defense counsel's tactical purpose is readily apparent from the record. Indeed, in arguing the motion for a new trial, defendant's substitute counsel expressly acknowledged defense counsel made a "strategic and tactical decision" in not calling defendant's mother. Accordingly, we reject this assignment of ineffectiveness of counsel.

### b) *Brevity of argument*

Defendant next contends defense counsel was ineffective because his penalty phase argument was brief. It was brief; in transcript, three pages long. (The prosecutor's argument was longer by only a page.) However, the effectiveness of an advocate's oral presentation is difficult to judge accurately from a written transcript, and the length of an argument is not a sound measure of its quality. (*Weaver, supra,* 26 Cal.4th at p. 979; *People v. Cudjo* (1993) 6 Cal.4th 585, 634–635 [25 Cal.Rptr.2d 390, 863 P.2d 635].)

Defense counsel argued the trial was conducted on an aider and abettor theory; that Richard Cullumber was the actual killer; that defendant had expressed remorse as he told his story to Goldman and Buchanan; that the prosecutor in argument had acknowledged only a burglary had been planned; that life imprisonment without possibility of parole meant that defendant would never get out of prison; that sending another man to his death was not an appropriate response to this tragedy; that sentencing defendant to life imprisonment without possibility of parole was the second most severe penalty the law allowed and would not serve to condone defendant's crime; that the aggravating factors had to substantially outweigh the mitigating factors to warrant the death penalty; and that any lingering doubt the jurors may have had during the guilt phase, even though not amounting to a reasonable doubt, was sufficient for mitigation.

We conclude defense counsel's argument, though brief, did not fall below the standard of reasonably competent representation, and we find no reasonable probability that a different argument would have convinced the jury to vote for life over death. (*Weaver, supra,* 26 Cal.4th at p. 979; *People v. Lewis* (2001) 25 Cal.4th 610, 675 [106 Cal.Rptr.2d 629, 22 P.3d 392] [penalty phase argument two pages in length not inadequate representation]; *Mayfield, supra,* 5 Cal.4th at pp. 186–187 [brief, "perfunctory" penalty phase argument not inadequate representation].)

### 6. *CALJIC No. 8.85*

Defendant contends the standard instruction given here with regard to the factors the jury might take into account in determining the penalty (§ 190.3;

CALJIC No. 8.85) failed to adequately guide its discretion, in violation of defendant's rights under the Eighth and Fourteenth Amendments to the United States Constitution.

Defendant's various attacks on CALJIC No. 8.85 have been repeatedly rejected by this court, and we conclude he gives us no compelling reason to reconsider our decisions.

■ CALJIC No. 8.85 does not encourage the double-counting of aggravating factors. (*People v. Lewis, supra,* 25 Cal.4th at p. 669; *People v. Ayala* (2000) 24 Cal.4th 243, 288–289 [99 Cal.Rptr.2d 532, 6 P.3d 193].)

■ The federal Constitution does not bar consideration of unadjudicated criminal activity. (*Tuilaepa v. California* (1994) 512 U.S. 967, 976–977 [129 L.Ed.2d 750, 114 S.Ct. 2630]; *People v. Marks* (2003) 31 Cal.4th 197, 237 [2 Cal.Rptr.3d 252, 72 P.3d 1222]; *People v. Anderson, supra,* 25 Cal.4th at p. 601.) Moreover, defendant seems to complain the jury was permitted to consider prior criminal activity involving use or attempted use of force, whereas the prosecutor candidly acknowledged to the jury, "There is no evidence at all of any previous violent activity on the part of [defendant]."

■ "[A] reasonable juror would readily have identified" the "emotional disturbance" and "diminished capacity" factors as mitigating. (*People v. Benson* (1990) 52 Cal.3d 754, 802 [276 Cal.Rptr. 827, 802 P.2d 330]; see *People v. Williams* (1997) 16 Cal.4th 153, 268–269 [66 Cal.Rptr.2d 123, 940 P.2d 710]; *People v. McPeters* (1992) 2 Cal.4th 1148, 1191 [9 Cal.Rptr.2d 834, 832 P.2d 146].) "The presumption that the jurors in this case understood and followed the mitigation instruction supplied to them is not rebutted by empirical assertions to the contrary based on research that is not part of the present record and has not been subject to cross-examination. [Citation.]" (*Welch, supra,* 20 Cal.4th at p. 773.)[17]

■ Finally, failure to delete inapplicable statutory sentencing factors from CALJIC No. 8.85 as given did not violate defendant's rights under the federal Constitution. (*People v. Box* (2000) 23 Cal.4th 1153, 1217 [99 Cal.Rptr.2d 69, 5 P.3d 130]; *People v. Turner* (1994) 8 Cal.4th 137, 207–208 [32 Cal.Rptr.2d 762, 878 P.2d 521].) Likewise, the failure to identify which factors were aggravating and which mitigating was not error; the aggravating or mitigating nature of the factors is self-evident within the context of each case. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 509 [117 Cal.Rptr.2d 45, 40 P.3d 754]; see *Box,* at p. 1217.)

---

[17] As here, the defendant in *Welch* relied upon an article "claiming that interviews with former jurors or with randomly selected subjects show that many of the subjects failed to properly understand the concept of mitigation correctly after they had been given CALJIC No. 8.88. [Citations.]" (*Welch, supra,* 20 Cal.4th at pp. 772–773.)

### 7. *CALJIC No. 8.88*

Defendant contends giving the standard instruction on the weighing of aggravating and mitigating factors (CALJIC No. 8.88) violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. We have repeatedly rejected similar claims, and defendant gives us no compelling reason to reconsider our decisions.

"Defendant contends that the standard instruction on the weighing of mitigating and aggravating factors was impermissibly vague and misleading in that it failed to inform the jury that unless it found that the factors in aggravation outweighed the factors in mitigation, it could not impose a sentence of death, and in that it failed to inform the jury that if factors in mitigation outweighed those in aggravation, it must impose a sentence of life in prison without the possibility of parole. He also complains that the instruction's direction that before the jury may return a verdict of death, it must find that the aggravating circumstances are 'so substantial' as to warrant a sentence of death and not life imprisonment without possibility of parole, was vague and led to arbitrary decisionmaking. He claims violation of his right to due process of law and to a reliable and nonarbitrary penalty determination under the Eighth Amendment of the United States Constitution. [¶] We repeatedly have rejected identical claims and decline defendant's invitation to reconsider our prior rulings. [Citations.]" (*People v. Catlin* (2001) 26 Cal.4th 81, 174 [109 Cal.Rptr.2d 31, 26 P.3d 357] (*Catlin*).)

Defendant also contends the standard instruction, in referring to the "totality" of the aggravating and mitigating circumstances, erroneously implied a single mitigating circumstance could not outweigh any and all aggravating circumstances. However, the instruction was not susceptible of this interpretation. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1099–1100 [25 Cal.Rptr.2d 867, 864 P.2d 40].)

Finally, no instruction defining life imprisonment without possibility of parole was required. (*People v. Hughes* (2002) 27 Cal.4th 287, 405 [116 Cal.Rptr.2d 401, 39 P.3d 432] (*Hughes*).)

### 8. *Reasonable doubt and penalty determination*

Defendant contends failure to instruct the jury that the reasonable doubt standard governs the penalty determination violated his rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. We have rejected the identical contention, and defendant gives us no reason to reconsider our decision.

 "Defendant claims that it is unconstitutional to impose a sentence of death unless the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. This claim was first rejected by our court in *People v. Rodriguez* [(1986)] 42 Cal.3d [730,] 777–779 [230 Cal.Rptr. 667, 726 P.2d 113], and has been rejected ever since. (See, e.g., [*People v.*] *Snow* [(2003)] 30 Cal.4th [43,] 125–127 [132 Cal.Rptr.2d 271, 65 P.3d 749]; *Burgener, supra,* 29 Cal.4th at p. 884, fn. 7; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1150–1151 [124 Cal.Rptr.2d 373, 52 P.3d 572]; *Clair, supra,* 2 Cal.4th at p. 691.) As we recently stated: 'The Constitution does not require the jury to find beyond a reasonable doubt that a particular factor in aggravation exists, that the aggravating factors outweighed the mitigating factors, or that death was the appropriate penalty.' (*Burgener, supra,* 29 Cal.4th at p. 884, fn. 7.)" (*People v. Cox* (2003) 30 Cal.4th 916, 971 [135 Cal.Rptr.2d 272, 70 P.3d 277].)

 Defendant acknowledges this court has previously rejected similar arguments. However, as did the defendant in *Cox,* defendant "asks us to reconsider this position in light of two recent United States Supreme Court cases, *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], and *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428]. Specifically, defendant argues that the two cases read together mandate that the aggravating circumstances necessary for the jury's imposition of the death penalty be found beyond a reasonable doubt. We disagree. As this court recently stated in [*People v.*] *Snow, supra,* 30 Cal.4th at page 126, footnote 32: 'We reject that argument for the reason given in *People v. Anderson*[, *supra,*] 25 Cal.4th [at pp.] 589–590, footnote 14: "[U]nder the California death penalty scheme, once the defendant has been convicted of first degree murder and one or more special circumstances has been found true beyond a reasonable doubt, death *is* no more than the prescribed statutory maximum for the offense; the only alternative is life imprisonment without possibility of parole. (§ 190.2, subd. (a).) Hence, facts which bear upon, but do not necessarily determine, which of these two alternative penalties is appropriate do not come within the holding of *Apprendi.*" The high court's recent decision in *Ring v. Arizona*[, *supra,*] 536 U.S. 584 does not change this analysis. Under the Arizona capital sentencing scheme invalidated in *Ring,* a defendant convicted of first degree murder could be sentenced to death if, and only if, the trial court first found at least one of the enumerated aggravating factors true. (*Id.* at p. 603.) Under California's scheme, in contrast, each juror must believe the circumstances in aggravation substantially outweigh those in mitigation, but the jury as a whole need not find any one aggravating factor to exist. The final step in California capital

sentencing is a free weighing of all the factors relating to the defendant's culpability, comparable to a sentencing court's traditionally discretionary decision to, for example, impose one prison sentence rather than another. Nothing in *Apprendi* or *Ring* suggests the sentencer in such a system constitutionally must find any aggravating factor true beyond a reasonable doubt.' (Accord, *People v. Smith* (2003) 30 Cal.4th 581, 642 [134 Cal.Rptr.2d 1, 68 P.3d 302]; *People v. Prieto* (2003) 30 Cal.4th 226, 275 [133 Cal.Rptr.2d 18, 66 P.3d 1123] [*(Prieto)*].)" *(People v. Cox, supra,* 30 Cal.4th at pp. 971–972.)

### 9. *Constitutionality of California's death penalty statute*

Defendant raises a number of other constitutional challenges to California's death penalty statute, claims we have consistently rejected and find no persuasive reason to reexamine.

Accordingly, we continue to hold:

■ The death penalty law adequately narrows the class of death-eligible offenders. *(People v. Brown* (2004) 33 Cal.4th 382, 401 [15 Cal.Rptr.3d 624, 93 P.3d 244] *(Brown)*; *Prieto, supra,* 30 Cal.4th at p. 276.)

■ The jury is not constitutionally required to presume life imprisonment without possibility of parole is the appropriate punishment. *(Hughes, supra,* 27 Cal.4th at p. 404; *People v. Jones, supra,* 15 Cal.4th at p. 196.)

Nor is the jury constitutionally required to achieve unanimity as to aggravating factors. *(Brown, supra,* 33 Cal.4th at p. 402; *People v. Jenkins* (2000) 22 Cal.4th 900, 1053 [95 Cal.Rptr.2d 377, 997 P.2d 1044].)

■ The absence of a requirement that the jury make written findings does not render the law unconstitutional. *(Brown, supra,* 33 Cal.4th at p. 402; *Prieto, supra,* 30 Cal.4th at p. 275; *People v. Ochoa* (2001) 26 Cal.4th 398, 462 [110 Cal.Rptr.2d 324, 28 P.3d 78].)

Nor is it defective in failing to require intercase proportionality review. *(Brown, supra,* 33 Cal.4th at p. 402; *Prieto, supra,* 30 Cal.4th at p. 276; *People v. Lewis* (2001) 26 Cal.4th 334, 394–395 [110 Cal.Rptr.2d 272, 28 P.3d 34].)

The law is not constitutionally defective because the prosecutor retains discretion whether or not to seek the death penalty. (*Brown, supra,* 33 Cal.4th at p. 403; *Hughes, supra,* 27 Cal.4th at p. 404.)

The method of execution does not constitute cruel and unusual punishment. Moreover, matters bearing on the legality of the execution of the sentence, rather than the validity of the sentence itself, are not a basis for the reversal of the judgment. (*People v. Taylor* (2001) 26 Cal.4th 1155, 1176–1177 [113 Cal.Rptr.2d 827, 34 P.3d 937]; *People v. Samayoa* (1997) 15 Cal.4th 795, 864 [64 Cal.Rptr.2d 400, 938 P.2d 2].)

Finally, "we need not consider whether a violation of state or federal constitutional law would also violate international law, 'because defendant has failed to establish the premise that his trial involved violations of state and federal constitutional law . . . .' ([*People v. Jenkins, supra,* 22 Cal.4th at p.] 1055.) Moreover, had defendant shown prejudicial error under domestic law, we would have set aside the judgment on that basis without recourse to international law." (*People v. Hillhouse, supra,* 27 Cal.4th at p. 511; see *Brown, supra,* 33 Cal.4th at pp. 403–404; *Burgener, supra,* 29 Cal.4th at p. 885.)

### 10. *Automatic motion to modify verdict*

Defendant contends the trial court, in ruling on the automatic motion to modify the verdict (§ 190.4, subd. (e)), failed to apply the proper standard, properly consider the aggravating and mitigating factors, adequately state the reasons for its findings, or direct the clerk to record its reasons in the minutes. Only the last point has merit, and the error with regard to it was not, we conclude, prejudicial.

In ruling upon an automatic motion to modify the verdict under section 190.4, subdivision (e), the trial court "shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings. [¶] The judge shall set forth the reasons for his ruling on the application and direct that they be entered on the Clerk's minutes."

Section 190.4, subdivision (e) requires a court ruling upon a motion for modification to reweigh independently the evidence of aggravating and

mitigating circumstances and then determine whether, in its independent judgment, the weight of the evidence supports the jury's verdict. (*Catlin, supra*, 26 Cal.4th at p. 177; *People v. Crittenden* (1994) 9 Cal.4th 83, 150 [36 Cal.Rptr.2d 474, 885 P.2d 887].)

Defendant contends the court erroneously applied a deferential standard of review appropriate to appellate proceedings. To the contrary, the court expressly stated, "I do understand and agree that the Court must use its independent judgment in reweighing the evidence of mitigating and aggravating circumstances in determining what the penalty ought to be in this case and whether or not this Court agrees with the jury's verdict."

And contrary to defendant's claims, the court carefully reviewed the evidence bearing on each of the aggravating and mitigating factors and clearly explained why it found the aggravating factors substantially outweighed the mitigating factors. Defense counsel urged defendant's culpability was only that of an aider and abettor. The court agreed Cullumber was the "major culprit," but noted the evidence showed defendant's role was "not minor." Defense counsel brought up defendant's "drug use." However, there was no evidence, the court observed, defendant was under the influence of drugs at the time of the offenses. Defense counsel noted the remorse defendant had shown when confessing to Gail Goldman. However, the court observed that defendant's expression of remorse on that occasion was triggered by the television story concerning the crime, and that he had shown no remorse immediately after the murders, but rather had grandly purchased drugs for all of his housemates with the money he had stolen. The circumstances of the crime—that defendant participated in the brutal murders of his elderly victims to obtain money to buy drugs—was, the court stated, the most significant aggravating factor.

Apparently, the court did neglect to direct the clerk to enter the reasons for its ruling on the application in the minutes. However, the reporter's transcript provides an entirely adequate basis for review, and so it is not reasonably possible that this failure to comply with a statutory directive prejudiced defendant.

### 11. *Cumulative prejudice in penalty phase*

Defendant contends the cumulative impact of errors in the penalty phase compels reversal of the death penalty. We disagree.

### III. DISPOSITION

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied July 13, 2005. George, C. J., did not participate therein.