Filed 12/5/14  P. v. Benavides CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>VERONICA BENAVIDES,<br><br>    Defendant and Appellant. | F066012<br><br>(Super. Ct. No. F11501716)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Hilary A. Chittick, Judge.

Meredith Fahn, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Rebecca Whitfield, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Veronica Benavides was convicted of second degree burglary and grand theft pursuant to a theory of aiding and abetting.  She appeals her convictions on grounds of alleged prosecutorial misconduct.  We affirm the judgment.

# FACTUAL AND PROCEDURAL BACKGROUND

The Fresno County District Attorney charged Benavides by information with second degree burglary (Pen. Code, §§ 459; 460, subd. (b); Count 1), grand theft of personal property (Pen. Code, § 487, subd. (a); Count 2) and receiving stolen property (Pen. Code, § 496, subd. (a); Count 3).[1]  All charges pertained to the theft of items from a partially constructed residence in December 2011.  The matter was tried before a jury in September 2012.

Prosecution Case

Margie York was in the process of building a home in a rural section of Fresno County at the time of the subject incident.  On the morning of December 13, 2011, she received a phone call from her contractor informing her that some items were missing from the job site, including a high-end stove valued at approximately $4,900, an air conditioning condensing unit valued at approximately $2,000, and around $1,500 worth of carpeting.

Deputy Javier Puente of the Fresno County Sheriff's Department responded to Ms. York's report of a residential burglary at the corner of South Blythe and Dinuba Avenues in Fresno.  When he investigated the premises, Deputy Puente found pry marks around a lock on one of the doors to the home.  He also noted a distinctive set of tracks in the dirt which appeared to have been made by a vehicle with three different types of tires.

Deputy Puente's canvassing of the neighborhood led him to the home of Veronica Benavides, who also lived on South Blythe Avenue, about a quarter of a mile from the crime scene.  The deputy noticed a pick-up truck with mismatched tires parked outside of her residence.  He also saw traces of carpet fibers in the bed of the truck.

---

[1] All statutory references are to the Penal Code unless otherwise specified.

Benavides was at home when Deputy Puente arrived and was cooperative in responding to his inquiries about the truck. She claimed ownership of the vehicle, though it was actually registered to her live-in boyfriend, Juan Gutierrez. Benavides further represented that she was the only person to have driven the truck since 4:30 p.m. the previous afternoon. When Deputy Puente advised her of his suspicion that the truck had been used in a residential burglary, Benavides told him that she had loaned it to a man named "Miguel." The change in her story prompted Deputy Puente to detain Benavides for further questioning.

Detectives Michael Quintanilla and Jon Sims conducted a custodial interview with Benavides subsequent to her conversation with Deputy Puentes. She denied any responsibility for the theft of Ms. York's property, but provided only vague details about the possible involvement of the man named Miguel. Benavides claimed that she had loaned her vehicle to Miguel in the middle of the night, at around 2:00 a.m., "because Miguel needed the truck."

At some point during the interview, Detective Quintanilla obtained permission from Benavides to look through her cell phone. He found an outgoing text message to a person identified in her list of contacts as "Miguel 2" at 2:27 a.m. that morning. According to the detective's trial testimony, the message said, "Have you already moved everything from the corner?"[2] There was a subsequent incoming message from "Miguel 2" at 12:16 p.m., when Benavides was speaking with Deputy Puente, which said, "They are trying to scare you."

When confronted with the text messages, Benavides began to cry and admitted she had known Miguel was going to use the truck to steal property from a nearby residence.

---

[2] The actual message, which was written in Spanish, said: "Ya sacaste todo a la orilla?" Detective Quintanilla translated the message himself based on his ability to read and speak the Spanish language. Benavides testified to a different translation of the text, claiming that it read: "Did you already take out everything to the edge?"

Miguel allegedly called her at 2:00 a.m. to ask if he could borrow her vehicle "to rob the house up the street." Benavides assented to the request, picked Miguel up from a residence at 9352 South Brawley Avenue, and dropped him off outside of the victim's home. She later accompanied Miguel and another unidentified Hispanic male as they transported the stolen goods back to 9352 South Brawley Avenue. She waited while the men hid the items underneath a tarp, and then dropped them off in Raisin City at around 4:00 a.m. before returning to her own home.

Following her confession, Benavides took detectives to the location on South Brawley Avenue where she had last seen the stolen items. Appliances and materials matching those which had been reported stolen were found stashed underneath a tarp at the back corner of the property. The serial numbers on the recovered goods matched up with the contractor's inventory records, thus confirming that the items belonged to Ms. York.

Juan Gutierrez was called to testify about his knowledge of the defendant's whereabouts at the time of the burglary. He remembered being awakened by Benavides at around 1:15 a.m., after she had come home from grocery shopping, and briefly helping her unload the groceries before falling back asleep. He woke again at 4:10 a.m. to discover that both Benavides and his truck were gone. Benavides returned home at approximately 4:15 a.m. and told him that she had gone out to deliver cigarettes to a female friend. After she was arrested, Benavides admitted to Mr. Gutierrez that she had loaned the truck to Miguel and then used it to drive him to Raisin City.

Defense Case

Testifying in her own defense, Benavides portrayed herself as a gullible individual who was tricked into participating in the burglary by a person whom she barely knew (i.e., "Miguel"). She also accused the law enforcement officers who testified for the prosecution of lying about the details of her alleged confession. Rather than admitting

4.

knowledge of Miguel's criminal intentions, Benavides purportedly told the detectives, "I didn't do it," and provided them with the following version of events.

Benavides used Juan Gutierrez's truck to go grocery shopping on the evening of December 12, 2011 – an errand which took her approximately three or four hours to complete. She arrived home sometime between 2:00 a.m. and 2:30 a.m. the next morning. Miguel called Benavides on her cell phone at around 2:00 a.m. to ask if he could borrow her truck to pick up some belongings from an ex-girlfriend who was threatening to throw the items away if he did not retrieve them. He told Benavides that the ex-girlfriend lived close to her and that he would only need the truck for 10 to 15 minutes.

Benavides was not well acquainted with Miguel. She did not know his last name or where he lived, but nevertheless agreed to lend him the vehicle. Benavides attributed this decision to her kind and trusting nature, and denied being at all suspicious of the fact that a relative stranger was calling her at two o'clock in the morning to borrow an automobile. She explained: "Well, the way my brain works … I said if it only took 10 or 15 minutes, if it was before 2:30, my [boyfriend] gets up for work, will get ready for work at 4:10. As long as he's back – 10 to 15 minutes I said in my head it's not going to harm anything. I didn't see any harm in it, so I lent it to him."

During their initial conversation, Benavides told Miguel that he would need to pick the truck up from her residence because she had a large amount of groceries to put away. He showed up at her house about 15 minutes later, took possession of the vehicle, and drove off to conduct his business. Benavides acknowledged sending Miguel the 2:27 a.m. text message asking if he had "taken the things out to the edge." He called her back to say that he would be returning soon, and subsequently picked her up and took her with him to the house at 9352 South Brawley Avenue. After they arrived at that location, Benavides stood by as an unidentified man helped Miguel unload a large stove, an air

5.

conditioning unit, and some carpeting. The situation did not strike her as strange or unusual, and her only thought at the time was, "That's a nice stove."

As the men were unloading the cargo, Miguel said to Benavides, "Do you want to buy any of this? This is your only chance. Otherwise I'm going to sell it." She declined the offer. At trial, Benavides testified that the possibility of the items being stolen never occurred to her. It was not until the sheriff's deputies came to her house that she realized Miguel had committed a crime. Benavides also contradicted her boyfriend's testimony regarding the explanation she had allegedly given to him about using the truck to bring cigarettes to a friend. According to her, Mr. Gutierrez did not bring up the subject of her disappearance from their home because he was in a hurry to get to work ("He didn't have a chance to ask me … because I was cooking his lunch and then I was driving him [to his job]. There wasn't time for him to ask me anything.").

Other defense witnesses included Juan Gutierrez (testifying for a second time) and a man named Ramon Garcia. Mr. Gutierrez's testimony pertained to the alleged failure by sheriff's deputies to conduct a further investigation into Miguel's role in the burglary. Mr. Garcia was called to testify about Benavides' alleged tendency to lend the subject vehicle out to third parties, but he ultimately conceded that he had no personal knowledge of such behavior.

Verdict and Sentencing

The jury returned guilty verdicts on all charges. The trial court later dismissed Count 3 on its own motion based on the prohibition against dual convictions for theft and receipt of the same stolen property. (§ 496, subd. (a); *People v. Allen* (1999) 21 Cal.4th 846, 857.) Benavides received a split sentence pursuant to section 1170, subdivision (h) which required her to serve one year of an aggregate two-year term of incarceration in the county jail, followed by one year of mandatory supervised release.

# DISCUSSION

Benavides seeks reversal of her convictions on the basis of prosecutorial misconduct. While she alleges several instances of improper behavior in her briefs, all but two of the claims have been forfeited as a result of her failure to interpose sufficient objections or otherwise raise the issue of prosecutorial misconduct at the time of trial. As we will further explain, there are no grounds for reversal on either of the claims preserved for appeal.

## Forfeiture

""""The applicable federal and state standards regarding prosecutorial misconduct are well established. '"A prosecutor's … intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'"' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"""" (*People v. Abilez* (2007) 41 Cal.4th 472, 494.) In either case, a timely and specific objection on grounds of prosecutorial misconduct, coupled with a request for an admonition, is required to preserve the claim for appellate review. (Evid. Code, § 353; *People v. Wilson* (2008) 44 Cal.4th 758, 800; *People v. Hill* (1998) 17 Cal.4th 800, 820 (*Hill*).)

Here, the contentions we deem forfeited include four instances where the prosecutor below allegedly attempted to elicit improper testimony from a witness on direct examination, and two instances in which she allegedly vouched for the credibility of witnesses during closing argument. In the latter two examples, Benavides failed to object in any way. The other claims involve situations where the trial court sustained objections made in regards to relevance, lack of foundation, and questions calling for speculation, but was never asked to interpret the prosecutor's behavior as misconduct or to admonish the jury accordingly.

"Because we do not expect the trial court to recognize and correct all possible or arguable misconduct on its own motion [citations], defendant bears the responsibility to seek an admonition if he believes the prosecutor has overstepped the bounds of proper comment, argument, or inquiry." (*People v. Visciotti* (1992) 2 Cal.4th 1, 79.) An objection made on other grounds and without a request for an admonition is considered insufficient to preserve a claim of prosecutorial misconduct for appeal. (See, e.g., *People v. Dykes* (2009) 46 Cal.4th 731, 766 ["Counsel's ultimate objection was on the ground of relevancy, not prosecutorial misconduct, and he did not request an admonition. This claim is forfeited."].) The forfeiture rule may be set aside where the prosecutor's misconduct was pervasive, defense counsel made repeated but unsuccessful attempts to object to the inappropriate behavior, "'and the courtroom atmosphere was so poisonous that future objections would have been futile.'" (*People v. Friend* (2009) 47 Cal.4th 1, 29.) The present case, however, does not fall within the parameters of this exception.

Misstating the Evidence

It is impermissible for a prosecutor to misstate or mischaracterize the evidence presented at trial. (*Hill*, *supra*, 17 Cal.4th at p. 823.) Benavides contends that the following excerpt from the trial transcript evidences such misconduct by the prosecutor during closing argument.

| | |
|---|---|
| Prosecutor: | You've heard character testimony that Veronica Benavides is a person who is overly trusting in lending out the family truck. Well, the only person we really heard that from was her [boyfriend]. |
| Defense Counsel: | Objection. Misstates the evidence. |
| Trial Court: | Ladies and gentlemen, it's up to you to determine the evidence that you heard. Counsel's statements [are] not evidence. And if they conflict with the evidence, you should consider your own recollection of the evidence. |

Prosecutor:            Like I said, if you remember it differently, then I apologize. The only person we heard evidence of her loaning out the truck was [Juan Gutierrez]. Let me tell you why. Ramon Garcia came to testify; right? And what did he say when I asked him, 'Do you know of anybody she's actually loaned the truck out to?' 'No.' He had only heard it. He had only heard that she loans the truck out from the defendant and the defendant's [boyfriend]. He has no independent knowledge that she actually loans out the truck.

We view the prosecutor's initial failure to acknowledge the testimony of Ramon Garcia not as a prohibited misstatement or mischaracterization, but rather as a fair comment on the evidence before the jury. (See *People v. Harris* (2005) 37 Cal.4th 310, 345 ["The prosecution is given wide latitude during closing argument to make fair comment on the evidence, including reasonable inferences or deductions to be drawn from it."].) Mr. Garcia admitted on both cross and re-direct examination that his belief regarding Benavides' history of loaning out the truck was based entirely on hearsay rather than personal knowledge. His testimony thus had little evidentiary value, if any.

The jury was also admonished at the time of defense counsel's objection. When admonishment follows an objection by counsel, "we assume the jury followed the admonition and that prejudice was therefore avoided." (*People v. Bennett* (2009) 45 Cal.4th 577, 595.) Benavides fails to rebut this presumption.

Vouching for the Credibility of Witnesses

Appellant's remaining claim relates to an objection made by her trial attorney on grounds of improper prosecutorial vouching during closing argument. The incident unfolded as follows:

Prosecutor:            You might not like Deputy Quintanilla. You might not like Deputy Puente. But I would submit to you that their

9.

|                    | testimony was credible.  And I would submit to you that Deputy Sims' testimony is credible.  And there is nothing about their testimony that is made up or unreasonable.  [¶] The defendant says she doesn't spend time with Miguel, but she has his phone number.  Just another way, just another lie that we can tell is unreasonable.  You know.  I know.  That's unreasonable. |
| Defense Counsel:   | Objection.  Personal vouching. |
| Trial Court:       | Yes.  Ladies and gentlemen, the attorneys are not permitted to vouch with respect to witnesses.  So I'll sustain that objection. |

"Impermissible vouching occurs when 'prosecutors [seek] to bolster their case "by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it." [Citation.]  Similarly, it is misconduct "to suggest that evidence available to the government, but not before the jury, corroborates the testimony of a witness."'" (*People v. Linton* (2013) 56 Cal.4th 1146, 1207.)  However, prosecutorial assurances regarding the apparent honesty or reliability of a witness, if based on the evidence before the jury rather than upon the prosecutor's supposed personal knowledge, do not constitute improper vouching.  (*People v. Medina* (1995) 11 Cal.4th 694, 757.)

Since the trial court below provided an admonishment to the jury regarding the prohibition against vouching, we need not decide whether the challenged remarks rose to the level of prosecutorial misconduct.  As in other situations, "[w]e presume the jury heeded the admonition and that any error was cured." (*People v. Dickey* (2005) 35 Cal.4th 884, 914 [proper admonishment by the trial court precluded reversal on grounds of improper vouching].)  Furthermore, Benavides has not demonstrated any likelihood that the outcome of her case would have been different but for the prosecutor's

allegedly inappropriate comments.  (See *People v. Ellison* (2011) 196 Cal.App.4th 1342, 1353 ["we do not reverse a defendant's conviction because of prosecutorial misconduct unless it is reasonably probable the result would have been more favorable to the defendant in the absence of the misconduct."].)  Therefore, even assuming arguendo that prosecutorial misconduct occurred, such error would be harmless under any standard of prejudice.

## **DISPOSITION**

The judgment is affirmed.


_____
Gomes, Acting P.J.

WE CONCUR:


_____
Detjen, J.


_____
Franson, J.