Filed 3/14/16  P. v. Ortis CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D069289 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FSB1105354) |
| RANDY ORTIS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Victor Roy Stull, Judge.  Affirmed as modified.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Allison V. Hawley, Deputy Attorneys General, for Plaintiff and Respondent.

For his role in a shooting that followed an altercation outside a nightclub, a jury convicted defendant Randy Ortis of first degree murder, attempted premeditated murder, and assault with a firearm. The jury also found true certain firearm and great bodily injury enhancements. The trial court sentenced defendant to an aggregate determinate sentence of 17 years, to be followed by an aggregate indeterminate sentence of 82 years to life.

On appeal, defendant contends the trial court erred by (1) denying his posttrial motion for a new trial on the basis of ineffective assistance of counsel; (2) imposing a three-year great bodily injury enhancement on the murder count (which the Attorney General concedes was error); (3) sentencing defendant to "seven years to life" on the attempted murder count instead of to "life with the possibility of parole"; (4) improperly making dual use of the same factors to justify imposing consecutive sentences, an aggravated base term, and the upper term on an enhancement; and (5) imposing a restitution fine that violated the prohibition against ex post facto laws. We conclude the great bodily injury enhancement on the murder count and the sentence on the attempted premeditated murder count are unauthorized; we strike the enhancement on the murder count, and direct the trial court to modify the sentence on the attempted murder count. As so modified, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*The Prosecution Case*

In the early morning hours of November 19, 2011, defendant and two of his friends went to a nightclub in downtown Redlands, where they joined other friends.

2

Another group at the club that night included Kruze Kuaea, Jeremy Lavanway, and Michael Aqleh. Shortly before 1:24 a.m., there was an altercation inside the club during which Kuaea swung at someone and an unknown male punched Aqleh in the back of the head. The nightclub's security staff kicked Kuaea's group out of the club.

Someone called 911 and hysterically reported the disturbance, which prompted a Redlands police officer to remotely focus surveillance cameras on the nightclub area. One of those cameras focused on the sidewalk area in front of the club, which captured an ensuing altercation that ended with defendant shooting three people. The video footage was played for the jury and is part of the record on appeal. The footage and other evidence adduced at trial establish the following facts.

Defendant and several of his friends had exited the nightclub about three minutes before Kuaea's group was kicked out. Defendant and his friends hung around the sidewalk area in front of the club, where defendant made boxing gestures with his fists.

When Kuaea's group exited the club, an unidentified "short Hispanic male," who was a friend of someone in defendant's group, also exited and exchanged words with Kuaea's group. Kuaea's friend Lavanway had his hands up inside his t-shirt, but he testified he did not "think" he had any weapons on him that night. A few seconds later, Kuaea approached the unidentified short Hispanic man and punched him in the face, knocking him backwards. Defendant's friend, Steven Sowa, threw a punch toward Kuaea, and someone in Kuaea's group threw a punch back.

Defendant fired a gun toward the other group. As soon as defendant began firing, Kuaea's group began to retreat. Defendant kept shooting, hopping as he shot. Defendant

3

fired a total of five shots. Kuaea was struck and died from a gunshot wound to the chest. Lavanway suffered life-threatening gunshot wounds to his stomach, arm, and leg. An innocent bystander who had exited the club to smoke and talk to his girlfriend was shot in his shin; his wound later became infected and required surgery. Lavanway and the bystander each identified defendant in photographic lineups as the shooter; the bystander also identified defendant as the shooter at trial.

A few days after the shooting, defendant gave a .38 caliber handgun to his friend, Jacob Topoleski, and described it as "dirty."[1] Topoleski described defendant as "frantic." Police later executed a search warrant for Topoleski's house and seized the gun.

*The Defense Case*

Defendant testified in his own defense. He said he did not know anyone in Kuaea's group and had not noticed them inside the nightclub. He did not see any physical altercations inside the club, but heard some sort of commotion as he was heading outside. The club was too crowded for defendant to see what was happening.

Defendant admitted shooting the gun that night. He said he started carrying a gun for protection after he was stabbed a few months earlier. He did not know who stabbed him, and no one was ever prosecuted. Defendant claimed he shot Kuaea and Lavanway because he was fearful for his own life and the safety of his friends. While waiting outside the club for other friends to leave, defendant noticed that Lavanway kept putting his hand under his shirt. Defendant was concerned Lavanway may have had a weapon,

---

[1] Defendant testified he intended two meanings for "dirty": "dirty in residue and dirty as in . . . it was used . . . in the incident."

4

so defendant kept an eye on him. When defendant saw Kuaea punch the unidentified male and saw Lavanway "fumble with his right hand under his shirt," defendant put his hand on his gun and "withdrew" to take in his surroundings before shooting; he "didn't want to shoot just anyone."

Defendant explained he shot Kuaea because "he severely punched a friend of mine for no reason." He fired at Lavanway because he believed that Lavanway had a gun. Defendant claimed he used only the amount of force required "to stop the aggressors."

Defendant admitted he lied to police when they interviewed him about the incident. He initially denied being in Redlands on the night of the incident or having any involvement in the shooting. He never said anything to police about someone else having a weapon or giving the impression that person did by having his hand in his shirt. Defendant ultimately admitted he jumped around as he fired the gun; he continued firing even though Kuaea was backing up and appeared to be trying to run away; and he continued firing even though Lavanway was falling and people were trying to run.

*Jury Verdict and Sentencing*

The jury convicted defendant of first degree murder (Pen. Code,[2] § 187, subd. (a); count 4); attempted murder (§§ 664, 187, subd. (a); count 5); and assault with a firearm (§ 245, subd. (a)(2); count 6).[3] On all counts, the jury found true the allegations that defendant personally used and intentionally discharged a firearm, causing great bodily

---

[2] All further statutory references are to the Penal Code.

[3] Counts 4 through 6 were initially designated as counts 1 through 3, but were renumbered when the People amended the information.

5

injury or death.  (§§ 12022.5, subds. (a) & (d), 12022.53, subds. (b)-(d).)  The jury also found true the allegations that defendant committed the murder and attempted murder willfully and with premeditation and deliberation.  Finally, the jury found true the allegations that defendant personally inflicted great bodily injury in the commission of the attempted murder and assault with a firearm.  (§ 12022.7, subd. (a).)

With enhancements, the trial court sentenced defendant to an aggregate determinate term of 17 years in prison, to be followed by an aggregate indeterminate term of 82 years to life in prison.

## DISCUSSION

### I.  *New Trial Motion Based on Ineffective Assistance of Counsel*

Defendant contends the trial court "erred and violated his Sixth Amendment right to counsel by failing to grant his motion for substitute counsel to investigate and file a motion for new trial based on ineffective assistance of counsel . . . ."  We find no error.

### A.  *Background*

After the verdict but before sentencing, defendant requested that the court appoint new counsel to review the case and potentially file a motion for a new trial on the basis of ineffective assistance of counsel.  The court initially indicated it intended to grant the request, but at the next hearing stated that subsequent research revealed the court must first conduct a hearing to determine whether continued representation by the same counsel would substantially impair defendant's right to adequate counsel.  The court then held a closed hearing with only defendant and his counsel.

6

During the closed hearing, defendant explained he was dissatisfied with three aspects of his counsel's trial performance: his decision not to call certain witnesses, his handling of Lavanway, and his apparent lack of effort and interest.

Regarding uncalled witnesses, defendant believed his counsel should have called Kelsey Klepper and the nightclub's two bouncers. Defendant asserted Klepper would have testified that "she believed that someone in [Kuaea's group] had a gun and that they did or may have gone to their car before the shooting to get it." Defendant maintained Klepper's statement was documented in a police report, and defense counsel should also have had the officer testify. Defense counsel responded that Klepper lacked firsthand knowledge of any weapons and, thus, her "blurted" comment to the officer was speculative. In any event, defense counsel had placed Klepper and the officer on the witness list, but concluded during trial he had sufficient evidence without them.

Regarding the bouncers, defendant argued they should have testified to explain that Kuaea's group was "kicked out instead of them saying they walked out [of] the club, and their . . . actions inside the bar before the incident took place." Defense counsel explained that he chose not to subpoena one bouncer because he had a prior sex offense with which he could be impeached, and defense counsel did not want to jeopardize the defense's credibility. Counsel subpoenaed the other bouncer, who would have been able to testify about a fight on the dance floor, but unable to identify any of the participants.

Defendant said he was dissatisfied with two aspects of his counsel's handling of Lavanway. First, counsel should have brought to the jury's attention a portion of the video in which an individual appeared to "pick up an object"—perhaps a weapon—"off

7

Mr. Lavanway while he was on the ground . . . and walk[] away."  Counsel responded he chose to support the self-defense theory with other arguments, but added that in his closing argument he encouraged jurors to review the surveillance footage and to consider whether anyone took a gun from Lavanway.  Second, defendant believed defense counsel was "supposed to call [Lavanway] back" so that he would "tell the truth" about having a gun that night.  Counsel responded that, based on 14 years of experience, he has "learned . . . to not follow up with witnesses when they've already given [him] a gift" like Lavanway's uncertain response about having a weapon.

Defendant also argued his counsel suffered migraines that affected his performance, lacked interest in the case, "wanted to hurry up and  . . . get it over with," "could have worked harder," and fumbled over some words and names.  Counsel responded that although he suffered a bout of migraines before trial, the court provided ample time to recover such that he was not affected during trial.  Counsel recognized he "probably suffered from lack of sleep" due to the long hours he spent preparing a rigorous defense—consistent with his practice in other lengthy cases—but he did not believe his sleep patterns affected his performance.[4]  Counsel admitted he misspoke during his opening statement, but said he later clarified the error while the relevant witness was testifying.

---

4     Counsel acknowledged that at one point during trial he put on the record his concern that his lack of sleep may have jeopardized defendant's case.  He was referring to an earlier chambers conference during which he inadvertently revealed he would be pursuing a self-defense theory.  When counsel put the concern on the record, the court responded it did not believe counsel jeopardized defendant's case because it had been "known all along" that he would be presenting a self-defense or defense-of-others case.

The court determined, based on its 32 years of experience with hundreds of trials, that counsel's overall performance "was not substandard and . . . was well within the norm." The court also noted that "this was a very, very difficult case for [the defendant], mainly because of that video. There's just no way to impeach it. . . . I don't know anyone that could have got a better result for you, to tell you the truth . . . . So as to performance, I think I have no problem with it—neither in my subjective opinion [n]or my legal opinion; based on the law that I would find that, and I do find, that you were competently represented." The court reiterated, "I don't think we're anywhere near a *Strickland v. Washington* [(1984) 466 U.S. 668] standard where I would have to say that [defendant] was not rendered effective assistance of counsel."

### B. *Relevant Legal Principles*

" 'When, after trial, a defendant asks the trial court to appoint new counsel to prepare and present a motion for new trial on the ground of ineffective assistance of counsel, the court must conduct a hearing to explore the reasons underlying the request. [Citations.] If the claim of inadequacy relates to courtroom events that the trial court observed, the court will generally be able to resolve the new trial motion without appointing new counsel for the defendant. [Citation.] If, on the other hand, the defendant's claim of inadequacy relates to matters that occurred outside the courtroom, and the defendant makes a "colorable claim" of inadequacy of counsel, then the trial court may, in its discretion, appoint new counsel to assist the defendant in moving for a new trial. [Citations.]' " (*People v. Bolin* (1998) 18 Cal.4th 297, 346; see *People v. Stewart* (1985) 171 Cal.App.3d 388, 395; *People v. Marsden* (1970) 2 Cal.3d 118, 123

9

(*Marsden*).) "We do not find *Marsden* error where complaints of counsel's inadequacy involve tactical disagreements." (*People v. Dickey* (2005) 35 Cal.4th 884, 922 (*Dickey*).)

"[S]ubstitute counsel should be appointed when, and only when, necessary under the *Marsden* standard, that is whenever, in the exercise of its discretion, the court finds that the defendant has shown that a failure to replace the appointed attorney would substantially impair the right to assistance of counsel [citation], or, stated slightly differently, if the record shows that the first appointed attorney is not providing adequate representation or that the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citation]." (*People v. Smith* (1993) 6 Cal.4th 684, 696.) The decision to appoint new counsel lies in the sound discretion of the trial court and "will not be overturned on appeal absent a clear abuse of that discretion." (*Ibid.*)

## C. *Analysis*

The trial court did not abuse its discretion in denying defendant's motion to appoint new counsel. Defense counsel made clear during the closed hearing that he had tactical reasons for not calling certain witnesses. (See *Dickey, supra*, 35 Cal.4th at p. 922.) For example, Klepper's testimony was not only speculative, it was also proven demonstrably false by the surveillance video, which showed the shooting occurred before anyone in Kuaea's group left to retrieve a weapon. The subpoenaed bouncer could not identify any participants in the dance floor altercation (which defendant admitted he did not see). And the other bouncer's prior sexual offenses subjected him to impeachment,

10

which may have undermined the defense's credibility, which was critical in light of defendant's self-defense and defense-of-others defenses.

Defense counsel also clearly had a tactical reason for not re-calling Lavanway, who had already given the defense a "gift."  The record also confirms counsel *did* argue to jurors in closing that they should reexamine the surveillance footage to determine whether anyone removed a weapon from Lavanway's body after he was shot.[5]

Finally, the trial court observed defense counsel's courtroom performance.  Based on the trial judge's 32 years of experience, he found that defense counsel's performance "was well within the norm," and remarked that he did not "know anyone [who] could have got a better result."  We find no abuse of discretion in this conclusion.

II.  *Great Bodily Injury Enhancement on Murder Count*

Defendant contends the trial court erred by imposing a three-year great bodily injury enhancement on the murder count.  He asserts the jury never made such a finding, and, in any event, no such enhancement is authorized on a murder count.  (See § 12022.7, subd. (g) ["This section shall not apply to murder or manslaughter . . . ."]; *People v. Cook* (2015) 60 Cal.4th 922, 924 ["subdivision (g) of section 12022.7 means what it says: Great bodily injury enhancements do not apply to a conviction for murder or

---

5      On appeal, defendant offers a new take on this challenge.  He now asserts that his trial counsel should have had the surveillance video "enhance[d]" to conclusively identify the object removed from Lavanway's body.  We consider this new challenge forfeited.  In any event, the Attorney General convincingly argues that defense counsel could have had a valid tactical reason for not enhancing the video—doing so might conclusively establish that *no weapon* was removed from Lavanway, eliminating defense counsel's ability to argue the contrary based on the inconclusive video and testimony.

11

manslaughter."].)  The Attorney General agrees the trial court erred.  We accept the concession and strike the enhancement.

### III.  *Sentence on Attempted Premeditated Murder*

The trial court sentenced defendant to seven years to life on the attempted premeditated murder count.  Defendant contends this was error because the proper sentence for this offense is life with the possibility of parole.  (See § 664, subd. (a).)  The Attorney General disagrees, citing a footnote in *People v. Jefferson* (1999) 21 Cal.4th 86 (*Jefferson*) to support the proposition that "it is not improper for the trial court to include, as part of a defendant's sentence, the minimum term of confinement the defendant must serve before becoming eligible for parole."  (*Id.* at p. 101, fn. 3.)  We agree with defendant.

The statutory sentence for willful, deliberate, and premeditated attempted murder is "life with the possibility of parole."  (§ 664, subd. (a).)  It is a straight indeterminate sentence; it does not provide for a sentence range.  (See *ibid.*; *People v. Felix* (2000) 22 Cal.4th 651, 659.)  A person sentenced to this term is not eligible for parole until he or she has served seven years.  (§ 3046.)  However, although *Jefferson* held this parole ineligibility period is deemed a minimum term for purposes of enhanced sentencing under the Three Strikes Law (see *Jefferson, supra*, 21 Cal.4th at p. 96), we are not aware of any authority that provides it is otherwise a minimum term for purposes of modifying an indeterminate sentence of life with the possibility of parole.  Given *Jefferson*'s focus on enhanced sentencing under the Three Strikes Law, which is not at issue here, the footnote the Attorney General cites is inapposite dicta, which we decline to follow.

12

Accordingly, the authorized sentence for count 5 is life with the possibility of parole, not seven years to life. We will direct the trial court to modify the judgment to reflect a sentence of life with the possibility of parole.

IV. *Dual Use of Sentencing Factors*

Defendant contends for the first time on appeal that the trial court erred in selecting the sentence on count 6 (assault with a firearm) by improperly making dual use of the same aggravating factors in (1) imposing consecutive sentences; (2) selecting the upper term for the base term; and (3) selecting the upper term for the related enhancement for personally using a firearm. (See *People v. Scott* (1994) 9 Cal.4th 331, 350 (*Scott*) ["the court generally cannot use a single fact both to aggravate the base term and to impose an enhancement"]; *id.* at p. 350, fn. 12 ["the court cannot rely on the same fact to impose both the upper term and a consecutive sentence"]; § 1170, subd. (b).) Relying on well-settled law obligating defense counsel to bring such purported errors to the trial court's attention at sentencing, the Attorney General argues defendant forfeited this challenge. Alternatively, the Attorney General argues that a multitude of aggravating factors support the court's sentencing selections. We agree defendant forfeited this challenge, but even if he had not we would find no error.

A. *Background*

At the sentencing hearing, the trial court explained it was imposing a consecutive sentence on count 6 because "the victim was particularly vulnerable" and defendant was

13

"an active participant . . . in the commission of this crime."  (See Cal. Rules of Court, rule 4.414(a)(3), (a)(6).)[6]

The court explained that it was selecting the aggravated base term of four years on count 6 based on the court's findings that (1) the crimes were not committed "because of an unusual circumstance, such as great provocation, which is unlikely to recur" (rule 4.414(a)(7)), but rather were an unjustified response to an ordinary fistfight with disparate force; (2) "the crimes involved great violence, great bodily harm, being death and serious and great bodily injury to two others, and acts disclosing a high degree of cruelty, viciousness, and callousness" (see rule 4.421(a)(1)); (3) the victim "was particularly vulnerable" (see rule 4.414(a)(3)); (4) defendant was an active and major participant in the crime (see rule 4.414(a)(6)); and (5) defendant "has engaged in violent conduct that indicates a serious danger to society" (see rule 4.414(b)(8)).  The court stated it "thought about this very seriously" and was "mindful of the fact that [it] cannot use [these] factors to both aggravate a sentence and to impose a consecutive sentence."

The trial court explained that, "for the same reasons," it was selecting the aggravated term of 10 years on the personal firearm use enhancement.  (See § 12022.5, subd. (a).)

The court found the aggravating factors outweighed any mitigating factors.

### B.  *Defendant Forfeited This Challenge*

A defendant who does not object in the trial court to the court's statement of reasons for selecting discretionary sentencing choices forfeits his ability to challenge

---

6  All further rule references are to the California Rules of Court.

14

those selections on appeal.  (See *Scott, supra*, 9 Cal.4th at pp. 336, 353.)  This forfeiture rule applies in "cases in which the court purportedly erred because it double-counted a particular sentencing factor" (*id.* at p. 353), as defendant contends occurred here.  The "practical and straightforward" reasoning behind this rule is that "[r]outine defects in the court's statement of reasons are easily prevented and corrected if called to the court's attention."  (*Ibid.*)

Defendant contends he did not forfeit this challenge because he *did* object in the trial court.  However, the "objection" he cites in the appellate record is merely his argument in opposition to the probation report's recommendations; *defendant never objected to any purported dual use of aggravating factors*.  Consequently, he has forfeited the issue on appeal.

Defendant argues the forfeiture rule does not apply because a defendant need not object in the trial court to preserve a challenge to an "unauthorized sentence."  However, a sentence based on dual use of aggravating factors is not an "unauthorized sentence" for purposes of avoiding forfeiture.  (See *Scott, supra*, 9 Cal.4th at p. 354.)

C. *Defendant's Challenge Would Fail on the Merits*

Even if defendant had not forfeited this challenge, we would find no error.  We review the trial court's sentencing decision for an abuse of discretion.  (See *People v. Sandoval* (2007) 41 Cal.4th 825, 847.)

As noted, the trial court used *five* distinct aggravating factors for *three* distinct purposes.  Because each use required, at most, only a single supporting aggravating factor (see *People v. Osband* (1996) 13 Cal.4th 622, 728-729; *People v. Chism* (2014) 58

15

Cal.4th 1266, 1336), there was no error. Although the trial court repeated certain of the aggravating factors when discussing the different uses to which they were being put, the court stated it was mindful that it could not make dual uses of them. No error occurs where, as here, at least one valid aggravating factor supports each sentencing choice.

We are unpersuaded by defendant's challenges to the sufficiency of the evidence supporting certain of the aggravating factors. Regarding the victim's vulnerability, the trial court found the victim was "in a rather open setting, and he had no place to hide, no place to run, . . . [h]e was taken totally by surprise, had no means to defend himself or to seek shelter to prevent his harm; he had no opportunity to effect his escape. And it was a situation which may not be defined by lying in wait but it was very close to it." The record supports this finding.

The record also supports the trial court's finding that the crime was committed with a degree of cruelty, viciousness, and callousness. The victim in count 6 was an innocent bystander who had exited the nightclub to talk with his girlfriend and smoke a cigarette, when defendant shot him without warning and for no reason. (See, e.g., *People v. Harvey* (1984) 163 Cal.App.3d 90, 117 [finding viciousness and callousness where the victim had no opportunity to defend himself, there was no provocation of any sort, and the victim was shot without any explanation].)

The trial court did not abuse its discretion in selecting defendant's sentence.

V. *Ex Post Facto Challenge to Restitution Fine*

Defendant contends the trial court violated the constitutional prohibition against ex post facto laws because, although the court intended to impose a restitution fine in "the

16

minimum amount" allowed by statute ($200 when defendant committed his offenses), the court mistakenly imposed a $330 fine because the minimum statutory fine had increased (to $300) by the time defendant was sentenced and the fine was imposed.[7] He further asserts that if we find this challenge is forfeited because his trial counsel did not object to the amount of the fine during the sentencing hearing, his counsel was ineffective for not objecting. We disagree.

Preliminarily, defendant's challenge is not supported by the record. The trial court never stated that it intended to impose a fine in the *minimum* amount allowed by statute; the court stated it "will order a restitution fine in the *minimal* amount of $330." (Italics added.) That the trial court did not intend to impose the *minimum* statutory fine is further supported by the fact that the minimum fine in 2014 was $300, not $330.[8] In any event,

---

[7] When defendant committed his offenses in 2011, the minimum restitution fine under former section 1202.4, subdivision (b), was $200; the maximum was $10,000. (See Stats. 2011, ch. 45, § 1.) The Legislature subsequently amended section 1202.4, subdivision (b)(1) to increase the minimum amount of the restitution fine in increments over several years. (See Stats. 2011, ch. 358, § 1.) The minimum fine allowed when the court sentenced defendant in 2014 was $300; the maximum remained $10,000. (See § 1202.4, subd. (b)(1); Stats. 2011, ch. 358, § 1.)

[8] Defendant argues for the first time in his reply brief that the reporter's transcript indicates the trial court "may have misspoke[n]" when it ordered a restitution fine of $330 (instead of the 2014 statutory minimum of $300) because the court also imposed a parole revocation fine in the amount of $300, not $330. These fines are required to be in the same amount. (See § 1202.45.) Defendant reasons the trial court therefore intended to impose a restitution fine of $300. We will not address this apparent discrepancy because defendant forfeited the issue by raising it for the first time in his reply brief. (See *People v. Senior* (1995) 33 Cal.App.4th 531, 537.) In any event, the sentencing minutes and abstract of judgment make clear that the court ordered the restitution and parole revocation fines in the equal amounts of $330.

17

even if defendant's challenge were supported by the record, it would fail for the reasons we discuss below.

## A.  *Defendant Forfeited This Challenge*

"[A] defendant's failure to object in the trial court to the imposition of a restitution fine constitutes a waiver of the right to complain thereof on appeal." (*People v. Gibson* (1994) 27 Cal.App.4th 1466, 1469; see *People v. Turrin* (2009) 176 Cal.App.4th 1200, 1207.)  Defendant's trial counsel did not object to the amount of the fine the court imposed, and thus has forfeited this challenge on appeal.

We are not persuaded by defendant's argument that we should not find a forfeiture because his trial counsel's failure to object constituted the ineffective assistance of counsel.  "In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211; see *Strickland v. Washington, supra*, 466 U.S. at p. 694.)  "A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.  Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel." (*Carter*, at p. 1211; see *Strickland*, at p. 687.)

Defendant has not met his burden of showing his trial counsel lacked a sound strategy in not objecting to the amount of the restitution fine.  The probation report

18

recommended the court impose the maximum fine—$10,000. Defense counsel could reasonably have considered the $330 fine a victory. He could also have reasonably concluded that quibbling over a $130 difference in the restitution fine amount might undermine the credibility of his argument against imposing a longer prison sentence on the same count. We therefore adhere to our finding of forfeiture.

## B. *No Ex Post Facto Violation*

Even if we were to reach the merits of defendant's challenge, we would find no ex post facto violation. "A statute violates the ex post facto clause when, on its face or as applied, it retroactively ' "increase[s] the punishment for criminal acts." ' Thus[,] the prohibition on ex post facto laws prevents the government from changing the punishment for a criminal act after the act has been performed." (*People v. Callejas* (2000) 85 Cal.App.4th 667, 670.) Restitution fines are subject to the prohibition against ex post facto laws, and therefore must be imposed under the law in effect at the time of the offense (rather than at the time of sentencing). (See *People v. Souza* (2012) 54 Cal.4th 90, 143; *People v. Valenzuela* (2009) 172 Cal.App.4th 1246, 1248.) Because defendant was subject to a restitution fine of up to $10,000 when he committed his offenses, a *minimal* fine of $330 did not retroactively increase defendant's punishment and, therefore, did not violate the ex post facto prohibition.

## DISPOSITION

The judgment is modified to strike the great bodily injury enhancement attached to count 4. The trial court is directed to modify the judgment to reflect a sentence on count 5 of life with the possibility of parole. The trial court is further directed to modify the

19

abstract of judgment consistent with this disposition and to forward an amended abstract to the Department of Corrections and Rehabilitation.  In all other respects the judgment is affirmed.


HALLER, J.

WE CONCUR:


MCCONNELL, P. J.


PRAGER, J.*

---

\*      Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.